**NORWEST BANK BISMARCK, NATIONAL ASSOCIATION, Plaintiff and Appellant,**

v.

**William FAIMAN and Tony Schirado, Defendants and Appellees.**

Civ. No. 11,376.

Supreme Court of North Dakota.

March 7, 1988.

Lawrence R. Klemin, Bismarck, for plaintiff and appellant.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for defendants and appellees; argued by Albert A. Wolf.

GIERKE, Justice.

Norwest Bank of Bismarck appeals from a district court judgment, entered upon a jury verdict, dismissing its complaint against the defendants, William Faiman and Tony Schirado,[1] and from an order denying its motion for judgment notwithstanding the verdict or, alternatively, a new trial. We reverse and remand for a new trial.

---

1. This action was originally commenced against Gravel Supply, Inc., Faiman, and Schirado. Gravel Supply, Inc., which was jointly owned by Faiman and Schirado, filed for bankruptcy on September 6, 1985. It was thereafter dismissed as a party in this action.

Before 1976, Faiman operated a sand and gravel business under the name of Missouri River Sand and Gravel, a sole proprietorship, and also under the name of Bismarck Sand & Gravel, Inc. On several occasions Norwest had loaned Faiman money which was secured by equipment of either Bismarck Sand & Gravel, Inc., or Missouri River Sand and Gravel.

Pursuant to a purchase agreement dated July 26, 1976, Faiman sold Missouri River Sand and Gravel to James Borchert for $151,250. The purchase agreement required a $43,862.50 downpayment with the balance due in monthly payments over a ten-year period. The agreement included certain itemized equipment for the sand and gravel business.[2] Although a bill of sale was prepared, the parties dispute whether it was originally attached to the purchase agreement or was held in escrow by Faiman.

Borchert obtained financing from Norwest through a loan originally made to Missouri River Sand and Gravel, Inc., and a security agreement was executed by Borchert, as president, covering "all equipment ... whether now owned or hereafter acquired, including but not limited to: the equipment used in the operation of Missouri River Sand and Gravel, Inc.... as more fully described on the attached Schedule 'A'."[3] A corresponding financing statement was filed on August 9, 1976. When Norwest learned that Borchert had not transferred the equipment to the corporation, the loan was restructured as a personal loan to Borchert and a new security agreement was executed covering all equipment whether then owned or thereafter acquired including the equipment used in the operation of Missouri River Sand and Gravel, Inc. A corresponding financing statement was filed on January 11, 1978.

On September 28, 1981, Faiman filed a financing statement on the equipment identified in the July 26, 1976 purchase agreement. On September 29, 1981, Borchert's corporation, Missouri River Sand and Gravel, Inc., filed for bankruptcy. At that time Borchert was in default on his payments to Faiman pursuant to the purchase agreement and Borchert returned the equipment to Faiman. Faiman notified Norwest that he claimed ownership of the equipment covered by the 1976 purchase agreement. Based on its records Norwest declined to recognize Faiman's claim of a superior interest in the equipment, and it asserted that it had a superior interest in the equipment.

In March 1982, Faiman and Norwest arranged to resolve their dispute about the equipment. Norwest agreed to let Faiman have the equipment upon his assumption of Borchert's $102,000 debt. Faiman sold Schirado a half-interest in the sand and gravel business for $32,000 and they formed Gravel Supply, Inc. Faiman and

2. The following equipment was listed in an addendum to the purchase agreement:
Kolman 30' × 50' Conveyor S/N 202–50–20–61
Two 18" × 55' Pioneer Electric Portable Manual Lift
24' × 60" Stationary Electric Conveyor
Cedar Rapids Wash–All Senior Wash Plant Driver–Over Grizzly
6,000 gal. Fuel Tank W/pump
Cat 613 Scraper S/N 71M391
1970 Ford 250
1968 Ford T850 W/10 yd gravel dump
Allis Chalmers 645B S/N 3608
Missouri River Equity in two 1975 LT9000 Ford Trucks S/N 28716 and 28717
Lincoln 180 Amp Welder
Gilbarco Air Compressor Mod 12306–80010–131 S/N 43343
One Electric pump 6" × 4" 15 HP Motor
36" Kolman 40' Conveyor W/double deck 4 × 8 Buzzer
Cat 7T528 Motor Grader
Electric Control Box W/magnetic starters and start and stop buttons
Submersible pump and well located Airport Pit
1971 Ford 250
10 × 30 Steel Cardinal Murphy Scale–Portable S/N 17725
Sand and Gravel Pits Leased by William Faiman and Bismarck Sand and Gravel, Inc.

3. Schedule A listed the following equipment:
Kolman 30" × 50' Conveyor S/N 202–50–20–61
18" × 55' Pioneer Elec. Portable Manual Lift
24" × 60' Stationary Electric Conveyor
Cedar Rapids Wash All Senior Wash Plant Drive Over Grizzly
Kolman Screening Plant w 6–53 Diesel GMC Engine

Schirado, as officers of Gravel Supply, Inc., executed two promissory notes with Norwest for a total of $162,000. Those notes were secured by the inventory, equipment, accounts, and general intangibles of Gravel Supply, Inc. Norwest filed a financing statement on March 12, 1982. Between then and May 23, 1984 Norwest continued to advance money to the defendants to operate the business. On May 23, 1984, Faiman and Schirado, in their personal capacity and as officers of Gravel Supply, Inc., executed a renewal promissory note with Norwest for $380,000.

Upon default of the May 23, 1984 promissory note, Norwest commenced this action on that note, seeking $373,000 plus interest. The defendants admitted that they executed the promissory note and failed to make payments. However, they contended that Norwest induced them to execute the prior promissory notes through fraud, duress, and misrepresentation. They alleged that Norwest's conduct toward Faiman constituted bad faith because it had knowledge of Faiman's security interest in the equipment and attempted to claim a prior security interest in the equipment. The defendants contended that Norwest violated a duty of fairness, good faith and trust in its dealings with them by deceiving them into believing that Norwest had a prior security interest. The defendants also counterclaimed for $616,000 in damages, alleging that they lost other business opportunities because they had to operate Borchert's business to repay Norwest.

The jury returned a general verdict dismissing Norwest's complaint but failed to return a verdict on the defendants' counterclaim. The trial court construed that failure as a dismissal of the counterclaim. Norwest moved for a judgment notwithstanding the verdict or, alternatively, for a new trial, and the trial court denied that motion.

The primary dispute between the parties involves whether or not Norwest fraudulently induced Faiman and Schirado to assume Borchert's obligation in exchange for unencumbered title to the equipment. While Norwest primarily depended on the legal priority of its security interest negating any possibility of fraud or overreaching, the defendants' claim was based on its assertion that Norwest obtained knowledge of Faiman's expected security interest in the equipment through its customer-client relationship with Faiman and thereafter took a security interest in the same equipment, thus constituting fraud and overreaching on the part of Norwest.

■ There was sufficient evidence presented to the jury from which it could have determined that Faiman and Borchert intended that Faiman retain a security interest in the equipment. There was also evidence that Norwest had more than a generalized knowledge of Faiman's security interest. Both Borchert and Faiman were customers of Norwest and, through Norwest's banking relationship with Faiman, Norwest learned that Faiman considered the equipment covered by the purchase agreement to be security for the Faiman–Borchert transaction. There was evidence that Norwest used the knowledge it obtained through its customer-client relationship to undo Faiman's position and better its position and that Norwest failed to disclose its conduct to Faiman. The defendants presented evidence that Faiman's decision to assume Borchert's $102,000 obligation in 1982 was induced by Norwest's actions. While the evidence of bad faith by Norwest as to Faiman is sparse, we believe the evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury verdict as to the assumption of Borchert's $102,000 obligation. The evidence of bad faith as to Schirado is also sparse, but we believe the evidence supports an inference that, in executing the March 1982 notes in his capacity as an officer of Gravel Supply, Inc., Schirado relied upon Norwest's conduct toward Faiman. *Verry v. Murphy*, 163 N.W.2d 721 (N.D.1968) [suppression of that which is true by one having knowledge of the fact and who is a party to a contract, with intent to deceive another party thereto or to induce him to enter into a contract constitutes actual fraud and the inducement and reliance may be inferred from the surrounding circumstances]. Consequently,

we conclude that there was sufficient evidence to support a jury verdict of fraud and overreaching and the trial court did not err in denying Norwest's motion for judgment notwithstanding the verdict.

However, Norwest's motion for a new trial requires a different analysis. In *Okken v. Okken*, 325 N.W.2d 264, 269 (N.D. 1982), we discussed the distinction between a motion for judgment notwithstanding the verdict and for a new trial:

> "On a motion for judgment n.o.v., the trial judge has no discretion in viewing the evidence.... He must admit the truth of all evidence in favor of the verdict and the truth of all reasonable inferences from that evidence. He cannot weigh the evidence, and he cannot judge the credibility of witnesses. ... If, on the other hand, the motion is for a new trial, the trial judge has a certain amount of discretion in viewing the evidence. Here, the trial court may, within limits, weigh the evidence and judge the credibility of witnesses.... In particular, when a motion for a new trial is made and the reason given in support of the motion is that there was insufficient evidence to justify the verdict, the moving party is asking the trial court to decide whether or not the verdict is against the weight of the evidence. And in making this decision, the trial judge must weigh the evidence ...; he must consider that evidence which supports the verdict equally with that evidence which challenges the verdict. In short, when ruling on a motion for a new trial, the trial judge may consider *all* the evidence." [Citations omitted.]

A motion for a new trial is addressed to the sound discretion of the trial court, and a trial court's decision to grant or deny a motion for a new trial will not be disturbed on appeal absent an abuse of discretion. *Okken v. Okken, supra.* We have defined an abuse of discretion as arbitrary, unreasonable and unconscionable conduct. *Id.*

In this case, Norwest asserted in its alternative motion for a new trial that there was insufficient evidence to support the jury verdict and that Faiman and Schirado

should be estopped to use the bad faith defense in this action. Norwest argued that "[i]t is totally inequitable for Faiman and Schirado to have borrowed and failed to repay these huge sums of money in reliance upon a matter they failed to raise when they began borrowing the money. Faiman and Schirado should be estopped from using the bad faith defense in this action due to their conduct subsequent to 1981."

In its memorandum opinion denying Norwest's motion, the trial court stated:

> "The issue of estoppel raised by Norwest causes me the greatest concern. It is apparent that Norwest did not plead the doctrine nor did it make a motion for amendment of its complaint to conform to the evidence as to the issue. My instruction on page 13, lines, 8–12, touch upon the principles of estoppel and waiver. The instruction was neither requested nor objected to. It is assumed that the jury considered the instruction."

The instruction referred to by the trial court provided:

> "In determining whether Plaintiff mislead Faiman, you should consider the totallity [sic] of its dealings with him, including acts that occurred before and after Plaintiff perfected its lien and Faiman's continuing business relationship with Plaintiff."

The instruction does touch upon principles of estoppel but does not specifically address that issue as it relates to Norwest's argument. Although Norwest did not specifically plead estoppel or make a motion to the trial court to amend its complaint, the trial court did recognize that there was evidence presented to the jury regarding estoppel. Issues not raised by the pleadings may be tried by the implied consent of the parties, and the pleadings may be amended even after judgment to conform to the evidence. N.D.R.Civ.P. 15(b). Under these circumstances, we cannot blame the trial court for failing to initially instruct the jury about estoppel; however, that does not end our analysis of the court's consideration of that issue with-

in the context of Norwest's motion for a new trial.

██ The trial court's memorandum opinion also establishes that the trial court analyzed the evidence to determine whether there was sufficient evidence to support the verdict, but that it did not consider whether the entire verdict was against the weight of the evidence as required by *Okken v. Okken, supra.* In assessing the trial court's failure to weigh the evidence, we are mindful that fraud must be proved clear and convincing evidence. *Verry v. Murphy, supra.*

Under these circumstances, we conclude that the trial court's denial of Norwest's motion for a new trial was arbitrary, unreasonable, and unconscionable. We therefore conclude that the trial court abused its discretion in denying Norwest's motion for a new trial, and we reverse and remand for a new trial.

MESCHKE, J., and VERNON R. PEDERSON, Surrogate Justice, concur.

LEVINE, Acting C.J., and VANDE WALLE, J., concur in result.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of ERICKSTAD, C.J., disqualified.