UNION STATE BANK, Plaintiff and Appellee,

v.

William WOELL, individually and d/b/a Turning Point Manufacturing and Turning Point Manufacturing, Inc., a corporation; Defendant and Appellant,

and

G.L. Ness Agency, Defendant.

Civ. No. 880096.

Supreme Court of North Dakota.

Jan. 9, 1989.

DeMars, Turman & Johnson, Ltd., Fargo, for plaintiff and appellee; argued by Joseph A. Turman. Appearance by Timothy P. Hill.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, for defendant and appellant; argued by David L. Peterson.

Keith C. Magnusson, Bismarck, for amicus curiae ND Bankers Ass'n. Submitted on briefs.

LEVINE, Justice.

William Woell and Turning Point Manufacturing, Inc. [TPMI] appeal from a judgment awarding Union State Bank [Bank] $78,055.19 on two overdue promissory notes and dismissing TPMI and Woell's counterclaim against the Bank. We affirm.

TPMI was involved in the development and design of various products. In July 1979, Woell, the company President, approached the Bank to seek financing for the development and production of "The Supportable," which is a portable table designed to be used with various power tools. Woell asserts that the Bank assured him that long-term financing would be available if the product could be marketed nationally. The Bank asserts that it only agreed to make "certain advances to Woell on a short-term basis, which were from time to time renewed."

By November 11, 1982, Woell and TPMI were indebted to the Bank in the amount of $39,617. At that time, the notes were consolidated by the Bank into one note which was secured by various items of machinery and a $100,000 purchase order from Shopsmith, Inc. Woell had also executed an unrelated promissory note in the amount of $4,673.49 on November 4, 1982.

On March 11, 1983, TPMI, as principal obligor, with Woell as personal guarantor, entered into a "memorandum agreement" with the Bank to execute a new note in the amount of $39,753.65, representing the amount previously consolidated. This note was to be payable on September 15, 1983. The agreement further provided that if the note was not paid by that date Woell would sell the secured property at an auction "in a manner to pay in full the outstanding principal and interest to the [Bank] not later than October 15, 1983."

On September 10, 1983, Woell held an auction and sold some of the collateral. Woell asserts that other items of personal property, which were not pledged as security, were also sold at the auction. Ben Clapp, a representative of the Bank, appeared at the auction and informed the auctioneer's clerk that the Bank had a security interest in the sale items and asked that the proceeds check be made payable to Woell and the Bank, jointly. The auctioneer ultimately deposited the proceeds of the sale with the district court.

The Bank brought this action against Woell and TPMI seeking judgment on the November 1982 and March 1983 promissory notes and payment of the auction proceeds on deposit with the court. Woell and TPMI answered and counterclaimed, seeking damages from the Bank under various theories of liability for the Bank's alleged wrongful conduct in its dealings with them.

On February 29, 1984, the district court entered summary judgment in favor of the Bank on its complaint, declined to rule on the counterclaim, and granted a Rule 54(b), N.D.R.Civ.P., certification. The court also ordered that the Bank be allowed to withdraw the auction proceeds. TPMI and Woell appealed, and in *Union State Bank v. Woell*, 357 N.W.2d 234 (N.D.1984), we dismissed the appeal, concluding that the Rule 54(b) certification had been improvidently granted. The district court subsequently vacated its summary judgment and ordered that the auction proceeds be redeposited with the court.

On January 8, 1988, the Bank again moved for summary judgment, and moved to dismiss the counterclaim in part for failure to state a claim upon which relief can be granted under Rule 12(b)(5), N.D.Civ.P. The district court granted the mo-

tions,[1] awarded the Bank judgment against Woell and TPMI for $67,806.34, against Woell individually for $8,581.89, and awarded $1,666.96 in costs and disbursements against both defendants. The court interpreted the counterclaim as "attempt[ing] to raise the claims of tort of bad faith in a debtor-creditor relationship; breach of fiduciary duty on the part of the bank; fraud; and conversion." The court dismissed the claims of breach of the good faith obligation and breach of fiduciary duty for failing to state claims upon which relief can be granted. The court granted summary judgment on the conversion and fraud claims, concluding that there were no genuine issues of material fact and that the Bank was entitled to judgment as a matter of law. Woell and TPMI [hereinafter collectively referred to as Woell] appealed.

## TORTIOUS BREACH OF GOOD FAITH OBLIGATION

Woell asserts that the trial court erred in dismissing his tort claim for "breach of a good faith obligation." The trial court ruled that a tort action for breach of the obligation of good faith is not recognized in North Dakota and dismissed this portion of the complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(5), N.D.R.Civ.P.

If, on a motion to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion should be treated as one for summary judgment and disposed of as provided in Rule 56, N.D.R.Civ.P. Rule 12(b), N.D.R.Civ.P.; *Eck v. City of Bismarck*, 283 N.W.2d 193, 196–197 (N.D. 1979). In this case, depositions, affidavits and documentary evidence were presented and were not excluded by the court, and the court allowed each party a reasonable opportunity to present material pertinent to the motion in compliance with Rule 56. The parties, in addition to addressing the legal issue involved, alternatively argued to the trial court whether summary judgment on this claim was appropriate. Under these circumstances, even if the trial court incorrectly holds that the pleadings do not state a claim upon which relief can be granted, a reviewing court may uphold the dismissal of the claim under Rule 12 if summary judgment would have been proper at the trial court level. *Lurie v. State of California*, 633 F.2d 786, 788 (9th Cir. 1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981); *Experimental Engineering v. United Technologies*, 614 F.2d 1244, 1247 (9th Cir.1980); *Thompson v. New York Central Railroad Company*, 361 F.2d 137, 144 (2d Cir.1966).

We have not ruled whether a tort action exists in this jurisdiction for breach of the obligation of good faith in a commercial

---

1. Woell asserts that the district court erred in holding the hearing on the summary judgment motion less than 10 days after he received notice of the motion. *See* Rule 56(c), N.D.R.Civ.P. Woell's counsel requested an extension of time to respond to the motion and requested that the hearing date be changed because he would be unable to attend. The district court allowed Woell 10 additional days to respond, but refused to change the hearing date.

A party cannot assign as error that which is not prejudicial to him. *Johnson v. Northwestern Bell Telephone Co.*, 338 N.W.2d 622, 627 (N.D. 1983). Woell does not claim that he was denied the opportunity to submit relevant evidence in opposition to the motion for summary judgment. Rather, he asserts that he was denied the opportunity to orally present his arguments to the judge.

This court has held that litigants in civil nonjury trials have a right to have their attorneys make a final argument. *See Fuhrman v. Fuhrman*, 254 N.W.2d 97, 101 (N.D.1977). However, a trial court does not try facts in a summary judgment proceeding, but is only required to consider whether, upon the record before it, there exists a genuine issue of material fact or whether the law is such that resolution of any factual disputes would not change the result.

Since our review is limited to the record compiled before the trial court [*Flex Credit, Inc. v. Winkowitsch*, 428 N.W.2d 236, 239 (N.D.1988) ], and because we conclude from a review of the record that summary judgment was appropriately entered against Woell, we fail to see how Woell was prejudiced by the trial court's refusal to change the hearing date to allow his attorney to orally present argument to the court. *Cf. Hammons v. Schrunk*, 209 Or. 127, 305 P.2d 405 (1956) [no prejudicial error in trial court's refusal to allow oral argument to jury on issue which was improperly submitted to the jury].

context,[2] and decline to do so today, because even if we were to recognize such a tort, summary judgment against Woell on this claim would nevertheless have been proper.

Summary judgment is appropriate when there is no dispute as to material facts, or when, although factual disputes exist between the parties, the law is such that resolution of the factual disputes will not change the result. *Russell v. Bank of Kirkwood Plaza*, 386 N.W.2d 892, 897 (N.D.1986). On appeal we determine whether the information provided to the trial court, when viewed in the light most favorable to the losing party, precludes the existence of a genuine issue of material fact and entitles the moving party to judgment as a matter of law. *Binstock v. Tschider*, 374 N.W.2d 81, 83 (N.D.1985). The movant must establish that no genuine issue of material fact exists [*Northwestern Equipment, Inc. v. Badinger*, 403 N.W.2d 8, 9 (N.D.1987) ], but, when a movant does so, the adverse party must respond by setting forth specific facts showing that there is a genuine issue for trial as to any defense or counterclaim. *Gress v. Kocourek*, 427 N.W.2d 815, 816 (N.D.1988).

Woell's claim is premised on § 41–01–13 (1–203), N.D.C.C., which provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." § 41–01–11(19) (1–201), N.D.C.C.

■ The obligation to exercise good faith extends to "[e]very contract or duty" within the Uniform Commercial Code. Thus, in order for the good faith requirement of § 41–01–13 to apply, a contract or duty owing under the U.C.C., to which the good faith obligation can attach, must first be established. *Brown v. Indiana Nat'l Bank*, 476 N.E.2d 888, 894 (Ind.Ct.App. 1985); *see also State Bank of Hartland v. Arndt*, 129 Wis.2d 411, 385 N.W.2d 219, 223 (Ct.App.1986) ["Good faith cannot stand alone. The obligation of good faith must attach to some other conduct."] This requirement, although not always explicitly stated, is evident in the cases relied upon by Woell in urging us to recognize a tort action for breach of the good faith obligation. *See Commercial Cotton Co. v. United Cal. Bank*, 163 Cal.App.3d 511, 209 Cal.Rptr. 551, 554 (1985) [bank's duty under the code to not make payment on a customer's checks which contained unauthorized signatures]; *Tribby v. Northwestern Bank of Great Falls*, 704 P.2d 409 (Mont.1985) [bank's wrongful honor of a check that did not contain the customer's signature]; *First Nat'l Bank in Libby v. Twombly*, 213 Mont. 66, 689 P.2d 1226 (1984) [bank's performance of its contractual right to accelerate the maturity date of a promissory note]; *Sahadi v. Continental Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193 (7th Cir.1983) [bank's calling of a loan agreement without notice]; *Alaska Statebank v. Fairco*, 674 P.2d 288 (Alaska 1983) [bank's exercise of rights upon default under a security agreement]; *Kleiner v. First Nat'l Bank of Atlanta*, 581 F.Supp. 955 (N.D.Ga.1984) [bank's setting of interest rates under the terms of promissory notes]; and *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985)

---

**2.** This court has recognized a bad faith tort for the willful refusal of an insurance company to pay a valid claim by its insured. *See Corwin Chrysler–Plymouth v. Westchester Fire*, 279 N.W.2d 638 (N.D.1979). However, we have specifically refused to extend this bad faith tort concept to employment contracts. *See Hillesland v. Federal Land Band Ass'n*, 407 N.W.2d 206 (N.D.1987).

Woell asserts that our decision in *Production Credit Ass'n v. Halverson*, 386 N.W.2d 905 (N.D. 1986), "indicates" that we have recognized a tort cause of action based upon a breach of the good faith obligation. Although *First National Bank in Libby v. Twombly*, 213 Mont. 66, 689 P.2d

1226 (1984), in which the Montana Supreme Court recognized such a tort, was cited in that case, we merely held that Halverson had raised a genuine issue of material fact with regard to "breach of PCA's contractual obligation of good faith." *Production Credit Ass'n v. Halverson*, *supra*, 386 N.W.2d at 908. We did not address whether a tort cause of action existed for breach of the good faith obligation.

Cases discussing the question are collected in Annot., 55 A.L.R.4th 1026 (1987), and Note, *Lender Liability: Breach of Good Faith in Lending and Related Theories*, 64 N.D.L.Rev. 273 (1988). *See also Norwest Bank Bismarck v. Faiman*, 420 N.W.2d 357 (N.D.1988).

[bank's refusal to advance funds under a financing agreement].

In this case, Woell relies on the Bank's refusal to honor its "commitment to finance" his company and the Bank's actions with respect to the auction sale as the bases for its claim that the Bank tortiously breached its obligation of good faith. Regarding the Bank's refusal to honor its alleged "commitment to finance" his business, Woell has not cited any provision of the U.C.C. which can be construed to impose a "duty" upon the Bank under these circumstances to finance his operations. We must therefore consider whether an enforceable financing agreement existed between the parties.

Woell asserts that he and the Bank entered into an oral agreement that required the Bank "to continue loaning money to Woell up to the extent of the Bank's lending limit and then to put Woell into contact with other lending sources beyond this Bank's lending limit." The trial court correctly concluded that no enforceable agreement existed as a matter of law.

In *Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 355 (N.D.1986), we said:

" 'To be valid and enforceable, ... a contract must be reasonably definite and certain in its terms so that a court may require it to be performed. *Morey v. Hoffman*, 12 Ill.2d 125, 145 N.E.2d 644 (1957). It must spell out the obligations of each of the parties with reasonable definiteness. Indefiniteness as to any essential element of the agreement may prevent the creation of an enforceable contract. *Hansen v. Snell*, 11 Utah 2d 64, 354 P.2d 1070 (1960). Thus contracts must be definite enough to enable a court to ascertain just what is required of the respective parties in the performance thereof. Courts will not uphold agreements which are indefinite and uncertain as to the obligations imposed upon the parties thereto. *Richards v. Oliver*, 162 Cal.App.2d 548, 328 P.2d 544 (1958).' " [quoting *Mag Construction Company v. McLean County*, 181 N.W.2d 718, 721 (N.D.1970)].

■ Essential terms of an oral contract to continue lending money in the future include the amount and duration of the loans, interest rates, and, where appropriate, the methods of repayment and collateral for the loans, if any. *See Hunt v. McIlroy Bank and Trust*, 2 Ark.App. 87, 616 S.W.2d 759, 762 (1981); *Stansel v. American Sec. Bank*, 547 A.2d 990, 993 (D.C.Ct.App.1988); *McClellan v. Banc Midwest, McLean County*, 164 Ill.App.3d 304, 115 Ill.Dec. 351, 354, 517 N.E.2d 762, 765 (1987); *Labor Discount Center, Inc. v. State Bank & Trust Co.*, 526 S.W.2d 407, 425 (Mo.Ct.App.1975); *Malaker Corp., Etc. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 395 A.2d 222, 228 (1978); *In Re Destron, Inc.*, 59 B.R. 240, 244 (N.D.Ill.1986). Taken alone, the absence of any one of these terms may not be of great significance; however, viewed collectively, their absence is fatal to the existence of a binding contract. *Labor Discount Center v. State Bank & Trust Co., supra; see also* Restatement (Second) of Contracts § 33, comment b, illustration 2 (1981).

■ Woell has pointed to nothing in the record that would support even a reasonable inference that the Bank agreed to lend him in the future a specific amount of money over a specified period at a specified interest to be repaid under specified terms. There is no allegation that the parties agreed upon any of these specific items. While the Bank did loan Woell some funds, Woell has not demonstrated how these loans tell us the total amount of monies to be loaned nor does it provide us with any index to determine how the parties intended the alleged continuing financing to be arranged. *See Hunt v. McIlroy Bank and Trust, supra.* We therefore conclude that, as a matter of law, the alleged oral contract to provide future financing for Woell's business fails for lack of certainty of the contract's terms. There being no contractual or code-imposed duty to which the good faith obligation could attach, the Bank's refusal to continue to finance Woell's business provides no basis to support an action for breach of good faith.

Woell has made additional allegations of conduct by Clapp which, he argues, constitutes evidence of bad faith. He relies on Clapp's attendance at the auction sale to "direct[ ] the auctioneer to tie up all of the proceeds from the auction," as well as an affidavit submitted to the court by Clapp and a portion of Clapp's deposition testimony. Clapp's affidavit states:

"Plaintiff holds a security interest in and to said funds on deposit with this court which represent the proceeds of the sale of its collateral pursuant to its security agreements, . . ."

During his deposition, Clapp testified:

"Q. [By Mr. Peterson] As you sit in the chair today, Mr. Clapp, can you tell me based on your own knowledge whether or not all of the proceeds which you have now had in your bank since March of 1984 were indeed, in fact, proceeds from property that you had a security interest in?

"A. I've had nothing to change my mind from the time I made the Affidavit in December of 1983 when I wrote that. I've had nothing to change my belief from that time.

\* \* \* \* \* \*

"Q. So when you went out to the sale and talked to the auctioneer, or to the clerk, you didn't know at that time whether all of the items that were being sold were attached by your security agreements; isn't that true?

"A. I knew that there were some items that were not included in my security agreement.

\* \* \* \* \* \*

"Q. And you know now as you sit there today that you have the proceeds from all of those items that were sold that day, and have had them at the bank since at least March of 1984; isn't that true?

"A. Plus the auctioneer's fees, which I believe should have covered—at least I would imagine would have covered it. Because there were not, the items there that were sold were machinery and equipment. As I said, there were per-sonal items. But I suspect they weren't much. Most auctions that I attend, personal items are very minimal."

Under these allegations, Woell is presumably attempting to attach his claim for breach of good faith obligation to the Bank's performance under the terms of the March 1983 memorandum agreement between the parties. The agreement required that Woell provide the Bank with written proof no later than September 15, 1983 of his "agreement to sell the property owned by [him] and secured by the [Bank] at auction or otherwise," and placed upon him the "full responsibility for selling the secured property and making payment in full" to the Bank. The agreement is silent with respect to whether a Bank representative could attend the auction sale.

■ Clapp's attendance at the sale to inform the auctioneer of the Bank's security interest and request that the proceeds be paid jointly to Woell and the Bank cannot be considered evidence of bad faith on the part of the Bank. The normal incidents of a borrower-lender relationship necessarily include the lender's right to monitor and protect its status as a secured creditor. *See NCNB Nat'l Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987); *cf. In re United Thrift Stores, Inc.*, 363 F.2d 11, 15 (3d Cir.1966) ["a security interest is not invalid because of failure of the secured party to police the conduct of the debtor."] This is especially true where, as here, the secured creditor has given authorization to the debtor to sell the collateral, thereby resulting in the creditor's loss of its security interest in the collateral. *See* § 41–09–27(2) (9–306), N.D.C.C.; *Bank of Beulah v. Chase*, 231 N.W.2d 738, 744 (N.D.1975); and cases collected in Annot., 37 A.L.R.4th 787 (1985).

■ Although Woell asserts that some items sold were not pledged as security, it is undisputed that Woell failed to notify the auctioneer that the Bank had a lien on any of the items sold at the auction. Woell testified in his deposition that the reason he did not inform the auctioneer was because "[t]hat matter was never brought up." It therefore appears that until Clapp arrived

at the auction the auctioneer did not know whether the Bank had a security interest in any of the property or whether the Bank had authorized the sale.

In situations where a secured creditor has not authorized the sale of the debtor's collateral, auctioneers have been held liable to the secured creditor for conversion on the theory that the auctioneer is the agent of the debtor and therefore has no greater right to dispose of the collateral than the debtor. Annot., 96 A.L.R.2d 208 (1964). Liability is imposed regardless of whether the auctioneer had knowledge of the debtor's lack of authority to sell the collateral. Annot., 96 A.L.R.2d *supra*. The justification usually given for holding the auctioneer liable under these circumstances is that the auctioneer is in a better position to search the records for security agreements covering the collateral than are the buyers. *United States v. Equity Livestock Auction Market*, 575 F.Supp. 1524, 1527 (E.D.Wis. 1983); *Production Credit, Etc. v. Equity Coop, Etc.*, 82 Wis.2d 5, 261 N.W.2d 127, 128 n. 5 (1978); Quinn's Uniform Commercial Code Commentary and Law Digest ¶ 9–306[A][12][b], at p. S9–272 (1988 Cum. Supp. No. 1). Thus, at least as a means to protect himself from potential conversion liability to a secured creditor, the auctioneer had the responsibility, or duty, to search the records to determine whether the property to be sold was covered by any security agreements. The Bank's act of informing the auctioneer of its security interest, which the auctioneer had the responsibility of discovering in the first instance, therefore cannot be considered evidence of bad faith.

Furthermore, the obligation of good faith imposed by § 1–203 of the Uniform Commercial Code applies to each party to the contract. *Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 528 (Mo.Ct. App.1986). Under these circumstances, if an obligation imposed by the good faith requirements of the Code is to be implied under the terms of the parties' memorandum agreement, we believe that Woell had a good faith obligation, if not a statutory duty [*cf.* § 12.1–23–08, N.D.C.C.], to inform the auctioneer which items of property sold were subject to the Bank's security interest and which items were not. In light of Woell's failure to do so, the Bank took what can only be considered reasonable steps to protect its interest as a secured creditor by requesting that the auction proceeds be paid jointly to Woell and the Bank. Although Woell asserts that he had a telephone conversation with Clapp and "confirmed that the proceeds of those items which were the Bank security would be turned over at the conclusion of the auction," we conclude that, as a matter of law, the Bank did not breach a good faith obligation by declining to rely solely on Woell's verbal assurances.

Woell also relies on Clapp's affidavit submitted to the court which stated that the Bank holds a security interest in "said funds on deposit with this court which represent the proceeds of the sale of its collateral pursuant to its security agreements...." Woell asserts that the affidavit, coupled with Clapp's deposition testimony that "some items" sold at the auction were not subject to the Bank's security agreement, evidence bad faith on the part of the Bank and support his tort action for breach of the good faith obligation imposed by § 41–01–13 (1–203), N.D.C.C. We reject this assertion.

The auction proceeds were deposited with the court in connection with a case docketed as "civil no. 83–1490." The judgment in this case, docketed as number "83–1604," does not award the proceeds to either party. Thus, as far as this record shows, the funds currently remain subject to court supervision pending resolution of their ownership. As we have previously noted, Woell had the duty to notify the auctioneer which items of property sold were subject to the Bank's security interest and did not do so. Even to this date, Woell has failed to specifically identify any property that allegedly was not subject to the Bank's security agreement. Under these circumstances, we do not believe that the Bank's actions with regard to an unresolved dispute over entitlement to the funds can be considered evidence of bad faith.

Because summary judgment against Woell on his claim for tortious breach of the good faith obligation was appropriate, we conclude that the trial court properly dismissed the claim.

### CONVERSION

The conversion claim is premised on the events, discussed above, which surrounded the auction sale. Woell asserts that Clapp's testimony that proceeds of the auction sale covered "some items" not subject to the Bank's security interest precluded the district court from granting the Bank's motion for summary judgment on the conversion claim. We disagree.

■ Conversion is the wrongful exercise of dominion over the personal property of another in a manner inconsistent with, or in defiance of, the owner's right. *Great American Ins. v. American State Bank*, 385 N.W.2d 460, 462 (N.D.1986). *See also Napoleon Livestock Auction, Inc. v. Rohrich*, 406 N.W.2d 346, 351 (N.D.1987). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). But Woell, as the party bringing the counterclaim for conversion, had the burden of establishing that there exists a genuine issue of fact with regard to each of the elements of his conversion claim. *Celotex Corp. v. Catrett, supra; Gress v. Kocourek, supra.* Because Woell has not shown that the Bank wrongfully exercised dominion over his personal property, the conversion claim must fail.

■ Woell had the duty to inform the auctioneer what particular property was subject to the Bank's security agreement. His failure to do so, as much as the Bank's instructions to the auctioneer, caused the auctioneer to deposit the auction proceeds in the custody of the court. The auction proceeds were awarded to the Bank in the original February 1984 judgment, but that judgment was ultimately vacated by the district court after our dismissal of the previous appeal and the funds were ordered to be redeposited with the court along with accrued interest dating from September 10, 1983, the day of the auction. Although the Bank possessed the funds for a period of time, that possession was authorized by a court order. An act which might otherwise constitute a conversion is privileged when authorized by a court order which is valid on its face. *See Mid–America Fire & Marine Ins. v. Middleton*, 127 Ill.App.3d 887, 82 Ill.Dec. 555, 560, 468 N.E.2d 1335, 1338 (1984); *American States Ins. v. Citizens Fidelity Bank*, 662 S.W.2d 851, 853 (Ky.Ct.App.1983).

■ The record reflects that these funds remain under the control of the court presumably pending resolution of the parties' dispute over ownership. Even assuming that Clapp's affidavit statement that the Bank is entitled to all of the auction proceeds is incorrect, a mere assertion of ownership of disputed property alone does not constitute conversion. *See* 18 Am.Jur. 2d *Conversion* § 29 (1985); Prosser and Keaton on the Law of Torts § 15, at p. 102 (5th ed. 1984); *Winchester v. Joslyn*, 31 Colo. 220, 72 P. 1079, 1080 (1903).

■ We conclude that the district court properly granted summary judgment in favor of the Bank on Woell's conversion claim.

### FIDUCIARY DUTY

Woell also asserts that the trial court improperly dismissed for failure to state a claim upon which relief can be granted his claim that the Bank breached a fiduciary duty owed to him. He contends that a "creditor can develop duties akin to a fiduciary by reason of its control and dominion over its debtors," and asserts that the Bank did so in this case. For the reasons explained earlier in this opinion, we will treat the trial court's dismissal of this claim as a summary judgment disposition.

■ The relationship between a bank and its customers is viewed as a debtor-creditor relationship which does not ordinarily impose a fiduciary duty upon a bank. *See Faith, Hope and Love, Inc. v. First Alabama Bank,* 496 So.2d 708, 711 (Ala. 1986); *Umbaugh Pole Bldg. Co., Inc. v. Scott,* 58 Ohio St.2d 282, 390 N.E.2d 320, 323 (1979). Some courts have recognized that a fiduciary relationship may arise under circumstances which reflect a borrower's reposing of faith, confidence and trust in a bank with a resulting domination, control or influence exercised by the bank over the borrower's affairs. *See In Re Red Cedar Const. Co., Inc.,* 63 B.R. 228, 242 (W.D.Mich.1986); *Nicoll v. Community State Bank,* 529 N.E.2d 386, 389 (Ind.Ct. App.1988). Furthermore, the borrower or party reposing the confidence must be in a position of inequality, dependence, weakness, or lack of knowledge. *Nicoll v. Community State Bank, supra; see also Stenberg v. Northwestern Nat'l Bank of Rochester,* 307 Minn. 487, 238 N.W.2d 218, 219 (1976).

■ In a commercial context, the mere rendering of advice by the lender to the borrower, even if given in a sincere effort to help the borrower prosper, does not transform a business relationship into a fiduciary relationship. *Umbaugh Pole Bldg. Co., Inc. v. Scott, supra.* Rather, actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had "control" over a borrower. *NCNB Nat'l Bank of North Carolina v. Tiller, supra,* and cases cited therein.

■ Woell has not presented evidence to permit a reasonable inference that the Bank had any dominion or control over Woell's business. The record is clear that the Bank's association with Woell did not extend beyond the normal incidents of a debtor-creditor relationship. The trial court properly dismissed Woell's claim that the Bank breached a fiduciary duty owed to him.

## FRAUD

The trial court dismissed Woell's fraud claim, concluding that Woell's complaint had failed to meet the particularity requirements of Rule 9(b), N.D.R.Civ.P. The trial court stated that it "has had to guess that such a claim is even included in the counterclaim. Defendant has failed to plead the necessary elements of fraud and certainly has not pled fraud with particularity." Even if we assume that the pleadings are sufficient, Woell has not shown that there is a genuine issue of material fact about fraud.

■ This court is not obligated to search the record for evidence opposing a motion for summary judgment. *First Nat'l Bank of Hettinger v. Clark,* 332 N.W.2d 264, 267 (N.D.1983). With regard to the fraud issue, Woell's appellate brief merely discusses decisions of this court which, he contends, "show the difficulty in granting a summary judgment where an assertion of fraud has been made." Woell has not informed us what particular conduct on the part of the Bank is alleged to be fraudulent and has not connected any factual assertions to the elements of fraud under § 9–03–08, N.D.C.C. A party opposing a motion for summary judgment cannot leave to a court the chore of divining what facts are relevant and why facts are relevant, let alone material, to the claim for relief. *First Nat'l Bank & Trust Co. v. Jacobsen,* 431 N.W.2d 284, 288 (N.D.1988). Because Woell has not explained the significance of the evidence as it relates to his fraud claim, we conclude that dismissal of the claim was proper.

The judgment is in all respects affirmed.

ERICKSTAD, C.J., and MESCHKE, GIERKE and VANDE WALLE, JJ., concur.