JERRY HARMON MOTORS, INC., and Jerry Harmon, Personally, Plaintiffs and Appellants,

v.

FIRST NATIONAL BANK & TRUST CO., Robert A. Wanago and Richard H. Rolfstad, as Officers and agents of 1st National Bank & Trust Co., of Williston, and Individually, Defendants and Appellees.

Civ. No. 900072.

Supreme Court of North Dakota.

June 27, 1991.

Wheeler Wolf, Bismarck, for plaintiffs and appellants; argued by David L. Peterson. Appearance by Gerry Gunderson.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for defendant and appellee First National Bank & Trust Co.; argued by Kermit E. Bye. Appearance by M. Daniel Vogel.

Winkjer, McKennett, Stenehjem, Murphy & Reierson, Williston, for defendants and appellees Robert A. Wanago and Richard H. Rolfstad; argued by Richard A. McKennett.

Keith C. Magnusson, Bismarck, for amicus curiae N.D. Bankers Ass'n. Submitted on brief.

ERICKSTAD, Chief Justice.

Jerry Harmon Motors, Inc. and Jerry Harmon appeal from a district court judgment entered upon a jury verdict dismissing their action against First National Bank & Trust Company of Williston ["the Bank"], Robert Wanago, and Richard Rolfstad. We affirm.

Harmon Motors, a Williston automobile dealership, had floorplan financing for new vehicles with General Motors Acceptance Corporation ["GMAC"]. The Bank provided floorplan financing for used vehicles and other financing to Harmon Motors. In late 1986, Harmon determined that he could save money by transferring his used vehicle floorplanning to GMAC. GMAC would provide floorplan financing up to 85 percent of the value of the used vehicles and would also provide a separate $200,000 loan to Harmon Motors, in turn requiring a first priority security interest in various business assets. Harmon Motors would also require continued financing from the Bank in the form of a line of credit. During negotiations between the parties, the relative priorities of the parties' security interests in various business assets became a key issue.

On December 10, 1986, the Bank, at Harmon's request, issued a commitment letter outlining the Bank's terms for a $300,000 line of credit. Among other requirements, the Bank sought a first position security interest on all tools, furniture, fixtures, inventory, and equipment; a second position security interest on all parts; and a second mortgage on certain real estate. GMAC, however, required a first priority security interest on all of Harmon Motors' non-vehicle personal property for its $200,000 loan. Because some items of collateral were being sought by both the Bank and GMAC, Harmon and the Bank discussed the possibility of substituting other collateral, including an assignment of life insurance, a second mortgage and assignment of rents on certain real property, and security interests in vehicles not covered by GMAC's floorplan agreement.

On December 26, 1986, Harmon signed a promissory note, a line of credit agreement, a guaranty, and security agreements and financing statements covering all personal property of Harmon Motors. The parties dispute the nature of these documents. Harmon asserts that a final agreement had been reached and his signing of the documents finalized a binding contract. The Bank asserts that these documents were prepared for Harmon's signature as an accommodation because Harmon wished to leave for his winter home in Arizona, and that several items were left blank and the

Bank did not sign the documents so they could be completed and signed at a later date when the parties reached a final agreement. The Bank asserts that Harmon was told he would have to meet conditions which would be outlined in a second commitment letter replacing the December 10 letter.

On December 30, 1986, the Bank and GMAC entered into a subordination agreement whereby the Bank relinquished its priority position in all personal property to the extent of GMAC's $200,000 loan. GMAC then issued checks, payable jointly to Harmon Motors and the Bank, to pay off Harmon Motors' existing loans at the Bank.

On December 31, 1986, the Bank issued the second commitment letter outlining its new requirements for a line of credit, replacing the terms of the December 10 letter. The December 31 letter provided that the Bank would grant a $300,000 line of credit and required that Harmon provide a security interest in all personal property, subordinated to GMAC's interest up to $200,000, a second mortgage on certain real property, and an assignment of life insurance. The letter also advised that Harmon Motors' accounts with the Bank would be placed on a "collected funds" basis.

Harmon returned to Williston in early January, and on January 8 he went to the Bank to discuss the line of credit financing. The Bank apparently expressed concern that Harmon had not yet provided the mortgage and assignment of rents. Harmon provided these documents and they were recorded by the Bank that same day.

The parties also discussed Harmon Motors' checking account, which was overdrawn by $80,000. It is undisputed that the Bank loaned Harmon $80,000 to cover the overdraft; however, the parties offer differing explanations of the transaction. Harmon asserts that this $80,000 was advanced pursuant to the completed line of credit agreement. The Bank asserts that it was a "bridge" loan, secured by titles to ten repossessed vehicles, to provide tempo-rary interim financing until the line of credit agreement was finalized.

On January 9, the Bank sent Harmon a letter deleting the "collected funds" requirement of the December 31 commitment letter. This letter also required that Harmon provide to the Bank "for safekeeping" the titles to vehicles "collateralizing" the loan.

On January 13, Harmon went to the Bank and sought a $130,000 advance on the line of credit. He also hand-delivered a letter, dated January 12, 1987, in which he advised that he would not provide titles to vehicles to the Bank. The letter also stated that Harmon rejected the terms contained in the Bank's December 31 letter, and that Harmon was relying upon the December 10 letter:

> "I am again writing to advise you of our agreement dated December 10, 1986. I can not and will not accept your December 31, 1986 letter.
>
> "As I discussed with Ray McIntee, your verbage [sic] is totally different and is not acceptable. I relied on our contract of December 10, 1986 and therefore spent many hours of time and money to make this program work."

The following day Harmon returned to the Bank and hand-delivered another letter, dated January 14, 1987, reiterating Harmon's assertion that the December 10 letter constituted the parties' agreement and demanding that the Bank immediately advance $200,000 on the line of credit. The Bank responded by letter dated January 14 stating it would advance $140,000 on an "as needed" basis, conditioned upon Harmon providing a listing of unencumbered used vehicles having a wholesale value of $164,700 and agreeing to provide weekly listings of unencumbered vehicles. The letter also outlined the Bank's position that the December 10 commitment letter had been rendered inoperable by Harmon's inability to comply with its provisions requiring a first priority security interest in various business assets.

On the evening of January 14, Harmon sold a substantial number of vehicles to three close business associates. On Janu-

ary 15, without warning to the Bank or GMAC, Harmon closed the business. On that date, while many vehicles were being removed from the Harmon Motors lot, the Bank's agents seized three vehicles to which the Bank claims it held title.

Harmon and Harmon Motors sued the Bank and two of its officers, Wanago and Rolfstad, alleging breach of contract, conversion, and tortious bad faith.[1] The case was tried to a jury. At the close of the plaintiffs' case-in-chief the court dismissed the bad faith tort claim and dismissed all claims against Wanago and Rolfstad. The jury returned its verdict finding that no contract for a line of credit existed between the parties and that the Bank had not converted the vehicles taken on January 15. Judgment was entered dismissing all claims, and Harmon and Harmon Motors appeal.[2]

I. EXISTENCE OF CONTRACT

Harmon asserts that the trial court should have held as a matter of law that a complete, unambiguous written contract for a $300,000 line of credit existed. The trial court concluded that existence of the contract was dependent upon resolution of disputed factual issues and accordingly submitted this issue to the jury. The jury found that there was no contract.

■ Harmon relies upon language in *Hultberg v. City of Garrison*, 79 N.D. 356, 360, 56 N.W.2d 319, 321 (1952), stating that the determination whether an unambiguous written agreement constitutes a valid contract is a question of law for the court. *See also Gulden v. Sloan*, 311 N.W.2d 568, 571 (N.D.1981); *Gerhardt Construction Co. v. Wachter Real Estate Trust*, 306 N.W.2d 223, 226 (N.D.1981). However, we have noted that the determination of mutual consent, although resulting in a legal conclusion, necessarily involves factual questions. *Gulden v. Sloan, supra*, 311 N.W.2d at 571. Thus, the determination of the existence of a contract is a purely legal question only when mutual consent, and the other requisite elements of a contract, are demonstrated clearly and unambiguously on the face of the written contract.

■ Harmon asserts that the line of credit agreement and related documents which he signed on December 26, read in conjunction with the December 10 commitment letter, constitute a valid contract as a matter of law. Harmon's continued reliance upon the December 10 letter as part of the contract is misplaced. It is clear that Harmon did not, and in fact could not, comply with the provisions of that commitment letter because GMAC insisted upon a first priority security interest in essentially all of Harmon Motors' non-vehicle personal property. Thus, if any agreement was reached by the parties it was not as outlined in the December 10 letter.

■ The documents signed by Harmon on December 26, particularly the line of credit agreement, do not on their face clearly and unambiguously demonstrate mutual consent. The standard form line of credit agreement had several blanks left unfilled, in particular several blanks for identification of related documents including security agreements, mortgages, and guaranties. Although the mere fact that blanks are left in a written agreement does not automatically render it invalid, that fact, coupled with the failure to later fill in those blanks, at the very least raises a question of fact regarding the parties' intent that the documents be a complete, integrated contract. *See First National Bank, Bismarck v. O'Callaghan*, 143 N.W.2d 104, 106 (N.D.1966). As we noted in *Delzer v. United Bank of Bismarck*, 459 N.W.2d 752, 755 (N.D.1990), "[t]he question of whether the written contract was intended to be the complete final agreement is to be determined from the circumstances of the case." Similarly, in *Dole v. Hansen*,

---

1. This case has been before this court on two prior occasions concerning change of venue. *See Jerry Harmon Motors, Inc. v. First National Bank & Trust Co.*, 440 N.W.2d 704 (N.D.1989); *Jerry Harmon Motors, Inc. v. First National Bank & Trust Co.*, 436 N.W.2d 240 (N.D.1989).

2. For the sake of brevity, we will henceforth refer to the appellants collectively as "Harmon" and the appellees collectively as "the Bank."

238 N.W.2d 58, 61 (N.D.1975), we stated: "Whether an agreement is intended to be binding or whether it is not to be binding until redrafted and reexecuted is a question of fact to be determined by the trier of fact." In this case, the failure to complete, either contemporaneously or at some later date, several blanks in the standard form line of credit agreement raised a factual issue regarding the parties' intent that the agreement be binding.

■ In addition, the line of credit agreement was not signed by a representative of the Bank. The line of credit agreement included a line for the signature of an officer of the Bank. Rolfstad's name was typed at the end of this line, with room left for a signature. Harmon argues that language in the agreement rendered the Bank's signature unnecessary, and alternatively that the typewritten name on the signature line constituted a valid signature.

The lack of a signature on the line of credit agreement raises a factual issue about the Bank's intent to be presently bound by the agreement and it also raises a statute of frauds issue. Although, as Harmon asserts, there is language in the line of credit agreement which could be read to obviate the need for the Bank's signature, that interpretation would make the signature line in the agreement superfluous. At the very least, this creates an ambiguity regarding the need for a signature by the Bank.

■ Any such ambiguity, however, must be considered in light of the requirements of the statute of frauds. Section 9–06–04(4), N.D.C.C., requires that an agreement to lend money in excess of $25,000 must be in writing and "subscribed by the party to be charged." Thus, the line of credit agreement must be signed by the Bank if it is to be enforced against the Bank. Although there is some question whether Rolfstad's name typed upon the signature line constitutes a "signature" of the Bank sufficient to satisfy the statute of frauds, that determination turns upon the intention of the parties, which is a question of fact. *See Clark v. Coats & Suits Unlimited,* 135 Mich.App. 87, 352 N.W.2d 349, 354 (1984).

■ Harmon also points to the Bank's conduct, both before and after December 26, to support his assertion that a contract existed as a matter of law. In particular, Harmon notes the Bank's written comments in its files, the Bank's loan of $80,000, and various other actions by the Bank which Harmon asserts demonstrate the Bank's recognition of a binding agreement. All of these matters, however, are merely evidence of an agreement. They were presented to the jury, along with evidence supporting the Bank's theory that negotiations were ongoing but no finalized agreement was ever consummated. It was for the jury to weigh the conflicting evidence, draw inferences, and resolve the material factual disputes. The evidence cited by Harmon does not support its assertion that the trial court should have determined as a matter of law that a contract existed.

## II. STATUTE OF FRAUDS

Harmon asserts that the trial court should have determined the statute of frauds issue as a matter of law rather than submitting it to the jury.

■ The sufficiency of a memorandum to constitute a contract meeting the requirements of the statute of frauds is generally a question of law for the court. *Zitzow v. Diederich,* 337 N.W.2d 799, 802 (N.D.1983); *Johnson v. Auran,* 214 N.W.2d 641, 652 (N.D.1974). There are, however, instances when underlying factual determinations will have a bearing upon that conclusion of law. This is such a case.

■ The primary question presented by the statute of frauds in this case is whether or not the typewritten notation "Richard H. Rolfstad" on the signature line of the line of credit agreement satisfies the requirements of Section 9–06–04, N.D.C.C. It is generally held that a typewritten "signature" may be sufficient to satisfy the requirements of the statute of frauds, but only if the party intends to authenticate the instrument by that act. 72 Am.Jur.2d, Statute of Frauds §§ 358, 362 (1974); *see, e.g., Rader Co. v. Stone,* 178 Cal.App.3d 10, 223 Cal.Rptr. 806, 812 (1986); *Irving v.*

*Goodimate Co.*, 320 Mass. 454, 70 N.E.2d 414, 417 (1946); *Clark v. Coats & Suits Unlimited, supra,* 352 N.W.2d at 354; *Radke v. Brenon,* 271 Minn. 35, 134 N.W.2d 887, 891 (1965); *Hillstrom v. Gosnay,* 188 Mont. 388, 614 P.2d 466, 469 (1980); 2 Corbin, Contracts § 522 (1950). The determination whether or not the party intended to authenticate the document by the typewritten "signature" is a question of fact. *E.g., Clark v. Coats & Suits Unlimited, supra,* 352 N.W.2d at 354. Accordingly, it was appropriate to submit this issue to the jury.

■ Harmon also asserts that, even if it was proper to submit the statute of frauds issue to the jury, the trial court erred in refusing to give Harmon's requested instructions on totality of documents and partial performance.

To place Harmon's argument in perspective, it is necessary to briefly summarize the circumstances culminating in Harmon's request for these instructions. The Bank pleaded the statute of frauds in its answer to Harmon's amended complaint. The trial court twice ruled before trial that it would not decide the contract issues as a matter of law, but rather would submit those issues to the jury. At the pre-trial conference, the trial court set a deadline requiring that all requested instructions be submitted by the first weekend during trial. Harmon failed to submit requested instructions on totality of documents and partial performance by that date. After both sides had presented their evidence and rested, the trial court convened an in-chambers conference to go over the court's proposed final instructions and to hear objections to the proposed instructions. Harmon's counsel at that time presented handwritten requested instructions on totality of documents and partial performance. The trial court refused to give the requested instructions.

Rule 51(b), N.D.R.Civ.P., allows any party to submit written requested instructions "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs." The rule necessarily gives to the trial court discretion to set a reasonable deadline for submission of requested instructions, and discretion to refuse untimely requests.

The Court of Appeals of Ohio has so construed its similar rule. In *Houston v. Dawson,* 33 Ohio App.2d 190, 293 N.E.2d 884, 885–886 (1972), the court held that once the trial court had provided the parties a reasonable opportunity to submit requested instructions, the court could within its discretion refuse untimely requests. Similarly, in *Clarke v. Vandermeer,* 740 P.2d 921, 925–926 (Wyo.1987), the court held that the trial court could, in its discretion, refuse to consider requested instructions submitted at the time of taking objections, where the court had set an earlier deadline in a pre-trial order. *See also Schmidt v. Martin,* 212 Kan. 373, 510 P.2d 1244, 1250 (1973) (refusal to give a requested instruction because it was not requested within allowed time was within the sound discretion of the trial court).

Harmon does not assert that the deadline set by the trial court was unreasonable, nor does Harmon attempt to explain why he waited until the in-chambers conference to submit handwritten requests for instructions when the court had previously announced that these issues would go to the jury. As Harmon's requested instructions were clearly untimely, the trial court did not abuse its discretion when it refused to give them.

## III. CONVERSION

Harmon asserts that the trial court erred in failing to rule as a matter of law that the Bank converted Harmon's property.

■ Conversion is the wrongful exercise of dominion over the personal property of another in a manner inconsistent with, or in defiance of, the owner's rights. *Harwood State Bank v. Charon,* 466 N.W.2d 601, 603 (N.D.1991); *Zimprich v. Harvestore Systems, Inc.,* 461 N.W.2d 425, 428 (N.D.1990). Repossessing property, if attempted under inappropriate circumstances, may subject the secured party to liability for wrongful conversion and detention of the property. *Zimprich v. Harve-*

*store Systems, Inc., supra,* 461 N.W.2d at 428. A plaintiff in a conversion action, however, must recover on the strength of his own title, without regard to the weakness of that of his adversary, and must show that he has a property interest in the thing converted and the right to its possession at the time of the alleged conversion. *Zimprich v. Harvestore Systems, Inc., supra,* 461 N.W.2d at 429; *Napoleon Livestock Auction, Inc. v. Rohrich,* 406 N.W.2d 346, 352–353 (N.D.1987).

■ The conversion issue was hotly contested at trial and conflicting evidence was presented to the jury. Harmon asserted that the Bank had no rights in the vehicles allegedly converted and was relying solely upon unenforceable oral security agreements. Harmon also stressed that the Bank's actions interfered with the property rights of GMAC. The Bank presented evidence from which the jury could find that the Bank had title to or some other interest in the vehicles in question and had a right to possess the vehicles at the time of the alleged conversion. Under these circumstances, the trial court did not err in submitting this issue to the jury.

## IV. BAD FAITH

Harmon asserts that the trial court erred in dismissing his tort claim for breach of the obligation of good faith, as outlined in Section 41-01-13, N.D.C.C. [U.C.C. § 1-203]. Harmon relies upon the arguments made in *Union State Bank v. Woell,* 434 N.W.2d 712 (N.D.1989).

■ In order to establish a breach of the good faith obligation the party must first establish a contract or duty owing under the Uniform Commercial Code to which the good faith obligation can attach. *Union State Bank v. Woell, supra,* 434 N.W.2d at 716. Because Woell had failed to show such a duty, we specifically declined to decide whether a tort action exists in this state for breach of the obligation of good faith in a commercial context. *Union State Bank v. Woell, supra,* 434 N.W.2d at 715–716.

■ This case is identical to *Woell.* Harmon has failed to establish a contract or any other duty giving rise to the obligation of good faith. Although we recognize that the trial court dismissed this claim before the jury determined that no contract existed, the jury's ultimate verdict effectively renders this issue moot. Accordingly, we again find it unnecessary to decide whether a tort action exists for breach of that obligation of good faith in a commercial context. Under the circumstances presented, the trial court's dismissal of Harmon's tort claim was not reversible error.

Harmon has also raised the following issues on appeal: whether the court erred in refusing to allow Harmon to offer testimony of a banking expert; whether the court allowed sufficient time for counsel to respond to the court's proposed instructions; whether the court gave confusing or contradictory instructions; whether the court erred in excluding Harmon's economist's report from evidence; whether the court erred in excluding testimony of two additional witnesses; and whether the verdict of the jury was contrary to the greater weight of the evidence. We have thoroughly reviewed each issue, and we conclude that Harmon has failed to demonstrate any reversible error. *See Cullen v. Williams County,* 446 N.W.2d 250, 252–253 (N.D.1989).

The judgment of the district court is affirmed.

VANDE WALLE and MESCHKE, JJ., VERNON R. PEDERSON, Surrogate Justice and HODNY, District Judge, concur.

VERNON R. PEDERSON, Surrogate Justice, and HODNY, District Judge, sitting in place of GIERKE, J., and LEVINE, J., disqualified.