Joe NELSON, et al., Plaintiffs,

v.

**PRODUCTION CREDIT ASSOCIATION OF THE MIDLANDS, Defendant.**

No. CV88–L–238.

United States District Court,
D. Nebraska.

Aug. 25, 1989.

David H. Hahn, Lincoln, Neb., for plaintiffs.

Howard P. Olsen, Jr. and Steven W. Olsen of Simmons, Olsen, Ediger, Selzer & Ballew, P.C., Scottsbluff, Neb., for defendant.

## MEMORANDUM AND ORDER ON POST–TRIAL MOTIONS

URBOM, District Judge.

### MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

A Rule 50(b) motion for judgment notwithstanding the verdict may be granted upon the same grounds and standard as a motion for a directed verdict. That standard is stated in *Savage v. Christian Hosp. N.W.*, 543 F.2d 44, 46 (8th Cir.1976) as follows:

"Under ... federal ... law '[a] verdict can be properly directed only when the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict.' *Meitz v. Garrison*, 413 F.2d 895, 896 (8th Cir.1969). 'A directed verdict is in order only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party.' *Giordano v. Lee*, 434 F.2d 1227, 1231 (8th Cir.1970), *cert. denied*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971). 'In making this determination, the evidence, together with all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the non-

moving party.' *Decker–Ruhl Ford v. Ford Motor Credit*, 523 F.2d 833, 836 (8th Cir.1975)."

### I. *Breach of Contract*

The theory of breach of contract was submitted to the jury, the definition of the contract being:

"PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period and to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation ..."

The defendant asserts that, even if evidence were to support that definition of a contract, the terms were so indefinite as to constitute no contract at all. In *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 198, 252 N.W.2d 142, 146 (1977), the court said:

" '[T]he subject matter of the agreement must be expressed in such terms that it can be ascertained with reasonable certainty.' 17 Am.Jur.2d, Contracts, § 76, p. 416. 'Absolute certainty is not required, however, only reasonable certainty is necessary. A contract is not subject to the objection that it is indefinite so long as the parties can tell when it has been performed, and it is enough if, when that time arrives, there is in existence some standard by which performance can be tested.' *Id.* at 417."

In *Davco* there was an agreement, as described by the court,

"to mutually develop their respective properties for the benefit of both. Picnic agreed to do certain paving and granted Davco an easement across its property. In return Davco granted Picnic an easement across its property. Picnic thus would obtain ingress and egress to its property from West Dodge Road. Davco would obtain access to additional parking space enabling it to add on to the building on its property."

*Id.* at 196, 252 N.W.2d at 145–46.

The district court in *Davco* found the agreement indefinite and uncertain in re-

gard to the nature of the paving material to be used, the depth and thickness of the paving, the foundation work and site preparation work required, and the time within which Picnic was required to perform. The Supreme Court of Nebraska held that the provisions of the contract were sufficiently specific to permit enforcement, because under Nebraska law in a building and construction contract it is implied that the building will be erected in a reasonably good and workmanlike manner and will be reasonably fit for the intended purpose. That, coupled with the implied time of performance to be within a reasonable time under the circumstances, "cures any ambiguity otherwise inherent in the agreement." *Id.* at 198, 252 N.W.2d at 147.

■ Where the lending of money is involved, however, specificity is more important, because of the lack of implied terms that may be imposed. In *Union State Bank v. Woell,* 434 N.W.2d 712, 717 (N.D. 1989) the claim was as follows:

> "Woell asserts that he and the Bank entered into an oral agreement that required the Bank 'to continue loaning money to Woell up to the extent of the Bank's lending limit and then to put Woell into contact with other lending sources beyond this Bank's lending limit.'"

The court held that there was no enforceable agreement as a matter of law. The court said:

> "Woell has pointed to nothing in the record that would support even a reasonable inference that the Bank agreed to lend him in the future a specific amount of money over a specified period at a specified interest to be repaid under specified terms. There is no allegation that the parties agreed upon any of these specific items. While the Bank did loan Woell some funds, Woell has not demonstrated how these loans tell us the total amount of monies to be loaned nor does it provide us with any index to determine how the parties intended the alleged continuing financing to be arranged.... We therefore conclude that, as a matter of law, the alleged oral contract to pro-

vide future financing for Woell's business fails for lack of certainty of the contract's terms...."

*Id.* at 717. (Citations omitted)

Similarly, in *Labor Discount Center v. State Bank & Trust Company,* 526 S.W.2d 407, 425 (Mo.Ct.App.1975) the court held that a claimed oral agreement to continue interim financing was not sufficiently definite as to be enforceable where the due date, security, rate of interest and the time for repayment were not specified.

In *Neujahr v. Producers Comm. Ass.,* 838 F.2d 1003 (8th Cir.1988), a claimed contract was held to be insufficiently definite to take it out of the realm of the statute of frauds when the writing did not state the salary at which the plaintiff was to be employed, or the various kinds of insurance the plaintiff claims he was promised. The court said that provisions of this kind "are essential elements of the alleged oral contract." *Id.* at 1004.

■ In the case at bar the evidence that must be relied upon as proving a contract is essentially the testimony of Joseph Nelson. Beginning in about 1975 Joseph and Margaret Nelson for several years borrowed on a yearly basis from the Production Credit Association of the Midlands (PCA) for their short-term borrowing on a ranch operation. Loan papers designated yearly loans as due in one year and indicated the specific security involved. When the Nelsons needed more money, they would make application to PCA for "additionals." By August 1983, the operation had shown a loss for three consecutive years and the balance to become due at the end of 1983 was approximately $750,000. PCA expressed concern about the loan's liquid margin and the "historical loss trend." Exhibit 657.

Joseph Nelson's testimony continued:

"Q. ... Were you and your wife in the fall of 1983 looking for money to pay down the PCA?

A. Yes, we were.

Q. And why were you doing that?

A. Because it was a request by Rod Uhrig from the PCA that we obtain

four to $500,000 to put in as a pay down to the PCA.

Q. Did Mr. Uhrig in addition to requesting that pay down also request something else of you?

A. He requested a plan plus the four to $500,000.

Q. So this plan is the, was one of the responses to that request?

A. Yes it was."

The Nelsons then developed a "ranch plan" (Exhibit 65) with the help of Dr. Pat Reece and Jim Robb that contemplated completely stocking the ranch with feeder cattle to utilize the resources. Joseph Nelson testified that the Nelsons discussed the ranch plan with Wayne Goff, the president of the PCA, on November 3, 1983, at which Mr. Nelson told Mr. Goff of the plan and said, "we must fill up the pastures with calves, and we've got to fill the ranch completely" to which Goff replied, "we certainly need to do something and that sounds like it's probably a pretty good idea." Then in response to the question, "Did he tell you then that he would loan you money to fund the ranch plan?" Nelson testified: "Well, he said we can't do anything at this time until we get money put in here. We were shut off at that time, and he would not do anything until we come up with the money. They wanted to pay down to four to five hundred thousand dollars."

Nelson testified that Goff suggested that the Nelsons go to the Federal Land Bank for pay down money. Nelson testified that they went to the Federal Land Bank and applied for a loan of little over $500,000.00, but the loan was denied. They then went to Travelers Insurance Company and received a commitment to loan the Nelsons $350,000.00. They then relayed that fact to Goff and asked whether that would "be enough to make the plan work. And he said that would be fine."

Joseph Nelson testified that in February 1984, he talked with Tom Willnerd, telling Willnerd about the "ranch plan" and said that "we had to fill up the ranch with cattle, stock it completely." Nelson told Willnerd that Nelson and Skip Marland of Travelers Insurance Company had met with Dr. Pat Reece about the ranch plan. At that time the Nelsons had two delinquent notes with the Federal Land Bank— one on the ranch and one on the farm. Nelson asked Willnerd for money to pay those loans, "but until there was a definite commitment by Travelers we were—there was no funds available." Willnerd said the ranch plan "was a good idea because there had to be a definite plan here in the works in order for them to do this." Willnerd said, "we had to have Travelers' money in there to be able to do this, have a definite commitment from Travelers before there would be any funds."

"This," as referred to in the foregoing conversation with Willnerd, was not identified in the testimony of Nelson any more specifically and the only reference it reasonably can be said to have is the request for money to pay the delinquent loans on the ranch and farm.

With respect to funding the ranch plan, Nelson testified:

"Q. Did Mr. Willnerd say that the amount of money coming from Travelers would not be enough for the PCA to fund your plan?

A. No, he did not.

Q. Did Mr. Willnerd make any comments about the inadequacy of the amount of money you were borrowing from Travelers?

A. No, he did not.

\*    \*    \*    \*    \*    \*

Q. And was there any discussion about the—first of all, what was the term of the Travelers' loan?

A. The term of the Travelers' loan was for three years and this was brought up that we had to have three years on this plan to implement this plan.

\*    \*    \*    \*    \*    \*

A. Yes, it was discussed that—at the meeting there that we had to have at least three years, that Skip Marland made it quite clear to Tom Willnerd at the time he said whatever we do the ranch plan's going to take three years, my loan is for three years.

\*    \*    \*    \*    \*    \*

Q. ... Mr. Nelson, after that did Mr. Willnerd tell you any reason why the PCA couldn't go with you for three years?

A. No, he did not.

Q. Did Mr. Willnerd say that the PCA would not go with you for three years?

A. No, he did not.

\* \* \* \* \* \*

Q. ... Mr. Nelson, was anything else discussed at this meeting?

A. Not that I recall."

The next meeting with Mr. Willnerd was on February 24, 1984, when Exhibit 704, an application for a loan of $677,823.05 was made. Willnerd prepared the document and Nelson signed it, which contemplated the purchase of 425 calves. Nelson's testimony continued:

"Q. ... Mr. Nelson, without telling us what your cattle buyer said, just explain why you signed this document for the purchase of 425 head.

A. Well, we needed—we had so much grass available there, and until we got the funds from the Travelers, they didn't want to turn loose of very much, and I could take in a thousand head at that time and it was getting late to buy this many calves that were out in the spring here, and I could take in another thousand to run with these, and so thats what I did and then we agreed, Tom said that if we could do this for now—

\* \* \* \* \* \*

Q. ... Okay. So there was—was there discussion, Mr. Nelson, about the timing of the time of the year that these cattle were being purchased?

A. Yes, there was.

Q. And what did you tell Mr. Willnerd?

\* \* \* \* \* \*

THE WITNESS: That it was getting late in the spring and it was going to be hard to find this many good calves that hadn't been warmed up at this time of the year, and that I could take in a thousand and so we agreed that by taking in these thousand—

Q. ... I just want you to tell me, Mr. Nelson, what you told Mr. Willnerd.

A. That we could take these other thousand in for now then.

Q. What did Mr. Willnerd say to you?

A. He said he thought—

\* \* \* \* \* \*

THE WITNESS: He said that he agreed with that, this would be a good idea and we could start buying calves early next fall to fill it up then."

Thereafter, Joseph Nelson testified, he applied for a loan from Travelers. Travelers required a letter of credit in the amount of $17,500.00 from PCA and Nelson went to Wayne Goff for that letter. Goff said that he would send such a letter.

Nelson's testimony continued:

"Q. Was there anything else said at this meeting?

A. Unless this was the time that I asked him if the $350,000 was going to be enough to make the ranch plan work, and he says that would be fine.

\* \* \* \* \* \*

A. He said that—I asked him if $350,000 was going to be enough, they wanted four hundred to five hundred thousand, and I says is that going to be enough to make this plan work, and he says that would be fine.

Q. Was there anything else said?

A. Not that I recall."

The next meeting was in November 1984, with Willnerd. At that meeting Exhibit 718, an application for loan from PCA was filled out on November 14. Travelers' money had come in on July 31, 1984, and $96,000.00 of that was used to pay off the Federal Land Bank, the balance going to PCA. Nelson said that before he filled out the application for the loan, Exhibit 717, in the amount of $453,391.24 Willnerd did not tell Nelson anything about any discussions that he had had with other loan officers about the loan or any discussions that he had had with the board of directors about the loan. The application, Exhibit 717, anticipated the purchase of 625 feeder calves. Nelson said that he had signed that document:

"A. Because Tom Willnerd said—told him we needed to purchase a thousand and he said well, let's do the 625 for now, and I'll get you another four hundred. I'll go to the loan committee and get you another four hundred.

Q. ... Did you tell Mr. Willnerd—did you express to him the importance of filling up your ranch?

A. Yes, I did I said we've got to fill it to utilize the resources, to up the production, up the profit.

Q. Did he disagree with that?

A. No, he said he certainly knew that we had—we'd be understocked, it looked like, and that we needed to do something, and he would take this to the loan committee, wanted us to sign this and he would take the—he would go to the loan committee and get another four hundred.

* * * * * *

Q. And at this—at this meeting when you're signing this document did Mr. Willnerd tell you that you would have to sign a memorandum of understanding?

A. Yes, after I had signed everything—

Q. Just at this meeting?

A. I'm sorry, yes, he did. In November, yes.

* * * * * *

A. I had signed all these things, and he said he was sorry, he forgot to have me sign something. I said what was that, and he said just a minute, I'll be right back. About five minutes, ten minutes he come back and I said what's this, and he said well, it's a memorandum of understanding, and I was surprised and I said what does it say, and he says well, so he handed it to me and let me read it, he says Mr. Goff says that this goes with the loan, they wanted it for their files. It was after I'd signed all this other stuff.

Q. Was your wife present?

A. Yes, she was.

Q. Did Mr. Willnerd explain anything further about the memorandum of understanding to you?

A. Well, he went through it with us and he said that if we didn't make the $29,725, I think it was, that we had to find a different lender. Well—

Q. On that point, Mr. Nelson, what did Mr. Willnerd say about the $29,000?

A. Well, my wife asked him if we could make that much money and he said it would be easy with this plan that you have.

Q. Did you sign it right away?

A. No, we left the office and drove out around and discussed it.

Q. Now, Mr. Nelson, would you please turn to Exhibit 60 in your book? Is that the memorandum of understanding?

A. Yes, it is.

* * * * * *

A. We drove out, I was—I didn't know, I couldn't understand why they wanted this, and neither—I said we've got to have some time to think about this a little bit, Tom. So we drove, we left the office and drove around and we came—we read it and we thought we could do what it said, so we came back and signed it.

Q. Was there any discussions with Mr. Willnerd after you came back?

A. No, not really. We just signed it and—

Q. Then what happened?

A. We left the office.

Q. Now, during this meeting with Mr. Willnerd, at any time did Mr. Willnerd tell you that the PCA was not going to go along with your ranch plan?

A. No, he did not.

* * * * * *

Q. Did you go out then and start buying cattle?

A. No, we didn't.

Q. Why not.

A. There was no funds to start buying these cattle. They had to take it to the loan committee.

Q. Okay. After this meeting in November, in December did you want to buy some cattle?

A. Yes, definitely.

Q. Did you call Mr. Willnerd to tell him that?

A. Yes.

Q. What did he say?

A. He said I had to take it to the loan committee."

Giving the foregoing the construction most favorable to the Nelsons, it does not support a conclusion that PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period or to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation.

Furthermore, it is undisputed that Willnerd did not have the authority to commit PCA to such an agreement and each of the loans about which Joseph Nelson talked with Willnerd and which were consummated in writing were one-year loans approved by the loan committee and not by Willnerd alone. Nothing said by Wayne Goff could be construed reasonably as a commitment by PCA to provide operating capital for a full productivity of the ranch over a three-year period or to restructure the debt.

Stretching the evidence to the point of construing some kind of a three-year agreement would still leave the terms of such an agreement too indefinite to permit the enforcement of the contract. There was no evidence of anything the Nelsons agreed to do, other than an agreement to sell a farm at the highest price per acre as quickly as possible. There was no evidence of the total amount to be loaned, or the amount to be loaned in any one year (except the two written agreements, Exhibits 704 and 717, which are complete contracts in themselves and there is no claim that either of these was breached), or how repayment was to be made, or the interest rate to be charged, or when repayments were to be commenced or ended or the nature of the security. There was no course of dealing between the parties that could supply by inference any of these terms, because always the agreements in the past had been on a year-to-year basis with the repayment terms and interest rates fixed by agreement each year.

I conclude that the evidence did not support the finding of a contract to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period or to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation. Furthermore, I find that the terms of the contract, if a contract could be found, were not reasonably certain and, therefore, there could be no recovery for a breach. See *Restatement (Second), of Contracts*, § 33 (1981).

Accordingly, the motion for judgment notwithstanding the verdict must be granted as to the breach of contract claim.

II. *Misrepresentation*

■ The defendant asserts that the instruction to the jury on misrepresentation was prejudicially erroneous because it required "that the representation was made fraudulently." The defendant says that the plaintiffs' claim for fraudulent misrepresentation was dismissed and the only remaining claim was one for negligent misrepresentation, which does not require that the plaintiffs prove that the representation was made fraudulently. The exact status of Nebraska's law with respect to misrepresentation is somewhat murky, but I submitted the issue of misrepresentation under the heading "MISREPRESENTATION," not under either the heading "FRAUDULENT MISREPRESENTATION" or "NEGLIGENT MISREPRESENTATION." It was submitted in terms of burden of proof most favorable to the defendant, because it required the plaintiff to prove that the representation was made fraudulently. Even if the law of Nebraska is that there is no requirement that representation be made fraudulently, it was no prejudice to the defendant to have that additional requirement included as a plaintiffs' burden. While I do not have a transcript of the objections made to the instructions, I am confident that the defendant did not object to the inclusion of the requirement that the representation be fraudulent, although it is

likely that the defendant objected to the submission to the jury in any fashion the issue of misrepresentation.

■ Additionally, the defendant argues that the six alleged misrepresentations submitted to the jury should not have been submitted because of a lack of evidence.

The first matter submitted to the jury was:

> "the intention of PCA to provide financing for the Nelsons' ranching operations in accordance with the ranch plan in the 1984, 1985, and 1986 operating years."

A careful review of the evidence on this subject persuades me that there was insufficient support for that claimed misrepresentation to permit it to be submitted to the jury. The testimony of Joseph Nelson, the strongest testimony there was regarding any representations by any of the PCA personnel, is set out at some length in the section of this memorandum relating to claim of breach of contract. A review of it shows that there simply was no evidence that PCA represented that it intended to provide financing for the Nelsons' ranching operations in accordance with the ranch plan in the 1984, 1985, or 1986 operating years.

■ The second claimed misrepresentation was:

> "that the PCA had a special concern for its members beyond that of a regular commercial bank and that the PCA would conduct its business according to this special concern."

There was testimony at the trial that PCA differed from a commercial bank in that it was involved only in agricultural lending and that it considered its borrowers to be members. I have already ruled that there was no fiduciary duty owed by PCA to the Nelsons and the plaintiffs have submitted me nothing to persuade me otherwise. The evidence does not support a claim that any such representation was false or that the representation was made fraudulently or that the Nelsons relied upon it or that there was any damage from it.

The third claimed misrepresentation was:

> "the terms and conditions of the relationship between the parties after the Fall of 1983."

This broad, undefined claim is so indefinite as to have no substance. The plaintiffs' briefs in resistance of the present motions and their trial brief do not appear to deal with the specifics that are claimed to inhere in this general claim. I simply cannot tell what terms and conditions are supposed to have been misrepresented. If they have to do with a claimed agreement to fund the Nelsons' operation over a three-year period in accordance with the ranch plan, I already have concluded that there is insufficient evidence to support any claim that there was such an agreement. I do not know what other "terms and conditions" this claim represents. Accordingly, it should not have been submitted to the jury.

■ The fourth claimed misrepresentation was:

> "that the reasons for the PCA's requirement of a cash pay down of the Nelsons' loan with the PCA was to make the PCA's loan a sound loan for both PCA and the Nelsons."

The requirement of a cash pay down of the loan was first made, apparently, by Rodney Uhrig. By letter dated August 19, 1983, he expressed concern about Nelsons' declining financial position, the loan's workability, and the Nelsons' repayment capacity. He said there were several options available, including sale of livestock and real estate, but said that "the fact remains that your financial position requires substantial debt reduction (more than sale of the cowherd alone can achieve) as well as a reduction in overall operating costs if the loan is to return to a workable cashflow position. ..." After a meeting between Joseph Nelson and Uhrig, Uhrig wrote Nelson:

> "In order for the PCA to finance a program similar to that which you followed in the past year, a livestock margin position of $200,000 would need to be provided. To achieve this, additional long-term financing of $400,000–$500,000 would have to be obtained to retire the estimat-

ed PCA carryover debt, plus purchase of 600 head of calves. From our standpoint, the $400,000 figure is a minimum, since the loan's liquid margin could deteriorate swiftly if your historical loss trend continues.

Finally, I should stress the point which I made earlier, that if you choose to pursue the refinancing route, you should make every effort to obtain the maximum loan possible, since our position will rely almost entirely upon a liquid margin with secondary collateral of machinery and a third mortgage with limited equity...."

Exhibit 657.

Nelsons tried to get a loan of $542,000.00 from Federal Land Bank, but the bank refused to make the loan. Nelsons then went elsewhere, but the best loan they were able to make was with Travelers Insurance Company in the amount of $350,-000.00, of which about $250,000.00 went to PCA for the pay down. In reviewing the evidence I simply find nothing to suggest that there was any misrepresentation involved as to the reasons for the requirement of a pay down. The only reason stated, as far as I can tell, was to enable PCA to renew the loan. That did not involve a misrepresentation.

The fifth claim of misrepresentation was: "that the $350,000.00 loan from the Travelers would pay down the PCA and permit the PCA to fully fund the Nelsons' cattle operation to a maximum production level as provided by the ranch plan."

As analyzed elsewhere, there was neither an agreement nor a representation that PCA intended to or agreed to fully fund the Nelsons' cattle operation to a maximum production level as provided by the ranch plan.

The sixth claimed misrepresentation was: "by telling Travelers and the Nelsons that PCA intended to go along, in good faith, as the Nelsons' operating lender for a three-year period so that the Nelsons could implement their ranch plan and work their way out of debt."

The evidence does not support the claim that PCA ever told that to the Travelers or to the Nelsons.

It follows that the motion for judgment notwithstanding the verdict with respect to the claim of misrepresentation must be granted.

### III. Negligence

In the plaintiffs' trial brief the plaintiff says:

"While courts have generally not found a cause of action for negligent lending of money, there is a trend which finds that a bank or other lender can be liable when there is a special nexis (sic) between the life lender and the borrower."

Plaintiffs' Trial Brief, p. 73. They cite only Jacques v. First Nat. Bank, 307 Md. 527, 515 A.2d 756 (Md.1986), and Djowharzadeh v. City Nat. Bank and Trust Co., 646 P.2d 616 (Okla.Ct.App.1982). In the latter case the court held that summary judgment was inapplicable where a bank customer alleged that a loan officer wrongfully disclosed confidential financial investment information to the bank president's wife and the wife of the chairman of the board of directors, who then bought the investment property for their own account, causing the customer to lose a valuable real estate investment opportunity. The court held that there is a duty on the part of the bank of confidentiality owed to the customer not to reveal purposes for which the customer expects to invest the loan, if made.

The sole case in the plaintiffs' briefs that involves a holding that a lender has a tort duty to use reasonable care in the making of a loan is Jacques v. First Nat. Bank, 307 Md. 527, 515 A.2d 756 (1986). There a customer sought a loan to buy a residence. The bank agreed, for a $144.00 appraisal fee, to process the application and to hold the interest rate at 11⅞ percent for 90 days.

On a negligence theory the jury in Jacques awarded $10,000.00.

In upholding the jury award the appellate court analyzed the case as follows: Since the harm likely to flow from a failure to process a loan application carefully is an

economic one, the relationship that needs to exist between the parties as a prerequisite for imposing a tort duty must be closer than if the harm were for physical injury. Generally no tort duty will be found absent a showing of privity or its equivalent, where the risk of harm is economic loss. Here there was a contract—to process the application and to hold the interest rate at 11⅞ percent for 90 days. Valid consideration was given—the $144.00. Implicit in that contract is the agreement to perform with reasonable care. In dealing with the question of whether a tort duty should be recognized under those circumstances, the court said that the bank took on a significant obligation in agreeing to process the application, because the bank knew that Jacques had agreed either to proceed with the settlement of the purchase or forfeit a $10,000.00 deposit and lose the benefit of their bargain. In view of the dramatic increase in the prime rate of interest while the loan was being processed and the short time the Jacques were given by the contract to try for alternative financing (51 days), the court considered it doubtful that the Jacques had the ability to get alternative financing.

The Maryland court also spoke of the public nature of the banking business and noted that:

"The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill."

*Id.* 515 A.2d at 763.

Accordingly, the Maryland court held that a tort duty was placed upon the bank in the circumstances of that case.

The court rejected the argument that lending is an art, rather than a science, and that a difference of opinion might be present among persons making such loans. The same, the court said, could be said of physicians, yet a tort duty is imposed upon physicians. It also says that evidence of the practice of many banks and of the defendant bank established the standard.

In the case at bar the plaintiffs' brief in opposition to the defendant's motion for judgment notwithstanding the verdict and new trial cites at page 4 *Federal Land Bank of Omaha v. Gibbs,* 809 F.2d 493 (8th Cir.1987) for the proposition that institutions of the Farm Credit System are subject to common law theories "such as negligence, contract, fraud, etc." But the *Gibbs* case stands for nothing as broad as that. What it says at page 496 is:

"Buried under the meritless RICO, section 1983, and antitrust claims, the one contention of the Gibbs that has merit, if their allegations are correct, is that the PCA reneged on its agreement to provide them with funds to make the FLB payment, to buy cattle, and to keep their farm operating."

but says nothing at all about a common law duty to use due care.

■ The plaintiffs argue that there was a fiduciary relationship between the Nelsons and the PCA, but I previously have held that such was not the case and I am persuaded that I was correct. Nothing that I have been able to find or that counsel have been able to show me suggests that under Nebraska law there was such a fiduciary relationship. Furthermore, no case in Nebraska has held or even hinted that a lender has a tort duty to use reasonable care in the making of a loan. I conclude that if the issue were presented to the Supreme Court of Nebraska it would decline to impose upon a lender such a duty.

■ Even if the Nebraska Supreme Court were to adopt the same reasoning as was used by the Maryland court in the *Jacques* case, that would not reach the present case. In *Jacques* the bank and the customers had a specific contract, buttressed by consideration. In the present case there was no evidence of a contract to do anything with respect to the Nelsons. Even if there were evidence to support the plaintiffs' theory of an agreement by PCA to provide operating capital for the expan-

sion of the Nelsons' ranch operation to full productivity over a three-year period and to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation, that claim was sued under the breach of contract theory and cannot form a separate claim in negligence. Nothing in *Jacques* nor in Nebraska law suggests that both a contract action and a negligence action are permitted when duties rest upon a contract. When a claim is based upon a failure to comply with an express contractual provision, the nature of the action is in contract, rather than in negligence. *See L.J. Vontz Const. Co. v. State*, 230 Neb. 377, 432 N.W.2d 7 (1988); *Fuchs v. Parsons Const. Co.*, 166 Neb. 188, 88 N.W.2d 648 (1958).

In *Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston*, 526 S.W.2d 407, 425 (Mo.Ct.App.1975) the court said:

"The finding of the trial court that plaintiff failed to prove a contract of sufficiently definite terms to admit of enforcement is, in our opinion, well-founded. The amount of the alleged promise for additional interim financing was the subject of inconsistent testimony by some of plaintiffs' own witnesses, although one might conclude that the most likely figure was $500,000. There was not, however, any evidence as to due date, security, rate of interest, time for payment, etc. Taken alone, the absence of any one of these terms might not be of great significance; viewed collectively, however, their absence is fatal and the alleged promise was correctly found by the trial court to be too indefinite to admit of enforcement. *John Deere Co. of St. Louis v. Short*, 378 S.W.2d 496, 503 (Mo.1964); Restatement, Contracts, § 32 (1932)."

In *John Deere Co. of St. Louis v. Short*, 378 S.W.2d 496, 503 (Mo.1964), the court said:

"Nor was John Deere under any *contractual* obligation to grant cash loans or equipment loans to Short, either by the provisions of the three written contracts entered into by the parties, or as a result of I.L. Parks' gratuitous promise that John Deere would make a loan to Short. Short contends that I.L. Parks' statements that the company would make Short a loan resulted in a contractual obligation on the part of John Deere to make a loan, but such a promise would be unenforceable for uncertainty if for no other reason, since there was nothing said about the terms of the prospective loan—what amount, when the loan was to be made (except the vague reference to 'in the spring'), the due date for repayment, security, etc. More importantly, Parks had no authority to make such a commitment on behalf of John Deere. Under the evidence the only person in the John · Deere organization who had that authority was the vice-president and general manager. Nor do we find any basis for an estoppel to deny Parks' authority, as claimed.

*Id.* at 503.

The defendant has asked that the issues regarding negligence be certified to the Supreme Court of Nebraska. The plaintiffs, against whom I now find on the issues, have asked that I not certify those issues and I shall not do so.

■ There was, of course, evidence throughout the trial of agreements between the parties consisting of loans and promises to repay. Those are not the loans that are at issue here, except in the counterclaim. No duty to make new loans or to extend loans already made arose from previous loans made by the defendant to the plaintiffs.

## MOTION FOR NEW TRIAL

Rule 50(c) of the Federal Rules of Civil Procedure provides:

"(1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the

order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial; and if the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.

(2) The party whose verdict has been set aside on motion for judgment notwithstanding the verdict may serve a motion for a new trial pursuant to Rule 59 not later than ten days after entry of the judgment notwithstanding the verdict."

The standard for review on a motion for new trial is set out in *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891–92 (4th Cir.1980):

"The motion for a new trial on the merits, however, requires a review of the evidence under a different standard. Under Rule 59, F.R.Civ.P., a trial court may weigh the evidence and consider the credibility of the witnesses. Indeed, a trial judge has a duty to set aside a verdict and grant a new trial even though it is supported by substantial evidence, 'if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false or will result in a miscarriage of justice....' *Williams v. Nichols*, 266 F.2d 389, 392 (4th Cir.1959), *citing, Aetna Casualty & Surety Company v. Yeatts*, 122 F.2d 350 (4th Cir. 1941)."

## I. *Breach of Contract*

If it later is determined that the judgment notwithstanding the verdict was improperly awarded the defendant and it is concluded that there was a contract in which PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period and to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation, I need to resolve the question of whether the issues presented to the jury were properly presented.

The first submission was that the jury might find a breach by PCA "by unreasonably calling the Nelsons' loan and failing to look at the possibility of the Nelsons' ability to work out their debt situation by following the ranch plan." There was adequate evidence of the PCA's unreasonably calling the Nelsons' loan. There was not evidence, however, that PCA "failed to look at the possibility of the Nelsons' ability to work out their debt situation by following the ranch plan." PCA did look at the possibility. It did not accept the ranch plan, but that is quite different from looking at the "possibility." Thus as to that submission, I would grant a new trial.

The second submission was of a breach "by failing to assist the Nelsons in the development of a viable ranch plan." If PCA agreed to follow the ranch plan, then there was evidence that it failed to follow it and thereby failed to assist the Nelsons in the development of a viable ranch plan.

The third submission was of a breach "by only looking after the PCA's own interests and not to any interest of the Nelsons." There was evidence that PCA looked after its own interests only.

The next submission was of a breach by "slacking off of agreements and understandings that had been entered into by the parties." Again, if there was sufficient evidence of a contract to fund the ranch plan for three years, there was evidence of a slacking off of that agreement.

The next submission was of a breach "by offering substandard performance in agricultural credit analysis and advice and thereby increasing the risk of potential default of the Nelsons." That submission was properly submitted to the jury, if there was a contract to provide operating capital for the expansion of the Nelsons' ranch

operation to full productivity over a three-year period.

The last submission was of a breach "by unnecessarily increasing the risk of non-payment by the Nelsons." There was evidence to support that claim, if a contract existed.

The defendant argues that the evidence regarding damages was insufficient, but I am not inclined to think so. There was, however, strong evidence in opposition to the testimony of the plaintiffs' expert, Ellsworth Bartlett, but, all things considered, the jury had before it sufficient information from which to make a judgment about damages. Thus, I conclude that the only ground for the granting of a new trial on the breach of contract claim was the failure of evidence to support the allegation that PCA failed to look at the "possibility" of the Nelsons' ability to work out their debt situation by following the ranch plan. But on that ground, a new trial would need to be ordered.

## II. *Misrepresentation*

My earlier analysis regarding the specific issues of misrepresentation indicates that none of the six submissions was supported by the evidence. Even if one, but less than all, of the submissions was supported by the evidence, the fact that the remainder were not would require the granting of a new trial on the misrepresentation claim.

## III. *Negligence*

If it later be determined that under Nebraska law a negligence claim was possible, I am then obligated to determine whether there was sufficient evidence on each of the issues of negligence presented to the jury.

The first was negligence "by failing to follow the recommendations of the ranch plan in any lending after the Fall of 1983." There was evidence to support that claim.

The second claim of negligence was "by failing to take into consideration the desires of the Nelsons to work out their debt with the PCA." I do not find any evidence to support that issue. The evidence seems to me to have been that PCA did take into consideration the desire of the Nelsons to work out their debt, but not in the same manner that the Nelsons' desired. I do not find in the plaintiffs' expert's testimony that the standard of care in the industry required a yielding to the Nelsons' desire as completely as the stated submission would require.

The third claim of negligence was "by failing to consider all sources of information, including the ranch plan, the people who wrote the plan, the information available from the Extension Service, range management data from the University of Nebraska, and marketing techniques information from the University of Nebraska and the Farm Credit System." I think there was insufficient evidence to submit that issue to the jury. There was no evidence that PCA did not consider the ranch plan. It is true that Mr. Goff testified that he did not receive the ranch plan, but other persons in PCA who were the loan officers did discuss it and consider it, although not with a deference that it may have deserved.

The fourth submission was negligence "by failing to administer the plaintiffs' loan applications and loan renewals in accordance with the accepted practice of loan administration for PCA and agricultural lenders in Nebraska." The plaintiffs' expert, Norman L. Peterson, supported that claim.

Next was a submission of negligence "by failing to comprehend the notion that the problem in the Nelsons' operation was not in the expense side, but on the income side." This, also, was supported by Mr. Peterson's testimony.

The next submission was negligence "by failing to analyze and understand the Nelsons' credit needs when PCA required a pay down of its loan." I do not find in Mr. Peterson's testimony or otherwise an indication that the defendant owed to the plaintiffs any duty as broad as is implied by that submission. PCA did not fail to analyze or understand the credit needs. It may not have provided for those needs, but it was not because of a failure

to analyze or understand. That submission should not have been presented to the jury.

Next, was a claim that there was negligence "by failing to realize that the only way the Nelsons could pay off PCA from operations was through an increase in the number of cattle up to full utilization under an intensive range management program." That is a close question, but I am inclined to think that the evidence was sufficient to support that claim.

Next, was a claim of negligence "by failing to provide the Nelsons with sound loan advice in 1983 and 1984 when PCA told the Nelsons that pay down of their debt would increase the Nelsons' repayment capacity and that the 1984 operating money and additionals were enough for the Nelsons to make a profit." Again, the testimony supported that claim.

The last submission was of negligence "by not making a sound loan after the Travelers' commitment in the Spring of 1984." If there was a contract to make a loan permitting full utilization of the ranch, then the evidence supported the claim that there was not a sound loan made in the Spring of 1984.

Accordingly, I find that, within the provisions of Rule 50(c) of the Federal Rules of Civil Procedure, there needs to be a conditional granting of the motion for new trial.

IT THEREFORE IS ORDERED that the motion for judgment notwithstanding the verdict, filing 249, is granted and the motion for new trial, filing 249, is granted if the judgment entered as a result of the granting of the present motion for judgment notwithstanding the verdict is vacated or reversed.

IT IS FURTHER ORDERED that the motion to stay proceedings to post bond and motion to establish supersedeas bond pending disposition of defendant's post-trial motions, filing 258, are denied as moot; and the defendant's motion to certify questions of law to the Nebraska Supreme Court, filing 262, is denied.