Joe **NELSON** and **Margaret Nelson,** Appellants,

v.

**PRODUCTION CREDIT ASSOCIATION OF THE MIDLANDS,** Appellee.

No. 89–2554.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1990.

Decided April 9, 1991.

Rehearing and Rehearing En Banc Denied May 17, 1991.

---

David H. Hahn, Lincoln, Neb., for appellants.

Steven W. Olsen, Scottsbluff, Neb., for appellee.

Before JOHN R. GIBSON, Circuit Judge, and HEANEY and TIMBERS,* Senior Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Joe and Margaret Nelson appeal from an order granting judgment notwithstanding the verdict in favor of Production Credit Association of the Midlands (PCA). The jury found in favor of the Nelsons on their claims of breach of contract, negligence and misrepresentation and awarded damages to the Nelsons in the amount of $1,278,000. The district court[1] subsequently entered a judgment notwithstanding the verdict for PCA on all three claims,

---

* The Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

1. The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

and, in the alternative, granted the motion for a new trial.

On appeal, the Nelsons challenge the judgment notwithstanding the verdict by arguing that: (1) the district court should not have relied on North Dakota precedent when determining the validity of an oral contract formed in Nebraska; (2) sufficient evidence of misrepresentation existed to sustain the jury's verdict; and (3) the district court erred when it held that PCA had no duty to lend money to the Nelsons. Finally, Nelsons argue that the district court abused its discretion when it granted the provisional order for a new trial. We affirm the district court's entry of judgment notwithstanding the verdict and do not reach the issue of the ruling on the new trial motion.

Joe and Margaret Nelson were ranchers in Morrill County, Nebraska. They borrowed money each year to purchase cattle and pay their operating expenses. Each fall they sold cattle to repay the loans.

In 1975 the Nelsons changed lenders from a local bank to PCA, a cooperative organization. In November of each year, the Nelsons would present financial information to PCA and apply for a loan for the upcoming year. After reviewing the ranch's financial condition, PCA would decide whether to lend.[2] In exchange for the loans, the Nelsons would give PCA a lien on all ranch livestock, products, and machinery. In years when the ranch lost money, the Nelsons included the losses in the requested loan amount for the upcoming year, thus carrying the debt forward.

The Nelsons incurred losses in five of the seven years between 1977 and 1983. During that time PCA became concerned about the high expenses of the Nelson's farm and their mounting debt. In 1983, one of PCA's loan officers wrote to the Nelsons explaining that before PCA would consider the loan application for the 1984 operating year, the Nelsons would have to devise and implement a plan to reduce their outstanding debt with PCA.[3] PCA warned the Nelsons: "Your financial position requires substantial debt reduction (more than sale of the cow herd alone can achieve) as well as a reduction in overall operating costs if the loan is to return to a workable cashflow position."

PCA's request for a "plan" prompted the Nelsons to go to a management specialist and an economist at the University of Nebraska Panhandle Station for help. These experts devised a Ranch Plan[4] for the Nelsons. The Ranch Plan analyzed the production potential of the Nelsons' ranch, and proposed additional stocking and intensive grazing techniques to increase the ranch's profitability.

Three weeks after the August letter, Rodney Uhrig of the PCA wrote a second letter to the Nelsons stating:

> loan this fall or financing for the upcoming year. We also will require a workable, realistic quarterly cash flow within which you will be expected to operate.

Appendix for Appellee at 1–2, *Nelson v. PCA*, (8th Cir.1991) (No. 89–2554) (emphasis added).

---

2. The PCA approved and loaned the Nelsons money every year in which they made a loan application.

3. The August 1983 letter from Rodney S. Uhrig to Joe Nelson contained the following excerpts:

> As I explained earlier this week, we are extremely concerned about your declining financial position, the loan's workability, and your repayment capacity. The increasing negative trend has placed the PCA in the position of presently relying upon real estate security for adequate margin in one loan. As a short-term lender, this position is unacceptable, as is the increasing risk associated with the loan.
> ....
> In light of the foregoing, the association must advise you that *we will require a definite plan* to achieve the necessary debt reduction before consideration will be given to renewal of the

4. There is some disagreement between the parties whether this Ranch Plan was the "plan" which PCA called for in its August 1983 letter. Nelsons argue that PCA required the Ranch Plan before it would continue lending them money. PCA, on the other hand, argues that it called for a plan other than the Ranch Plan, a plan that would bring about substantial reduction in Nelsons' short term debt. According to PCA, the primary feature of any such plan had to be that it reduced the Nelsons' short term debt to PCA. The Ranch Plan which Nelsons presented to PCA did not address debt reduction, but only examined the potential operating uses of the ranch property.

Although I do not feel that refinancing your present debt is a solution to the problems that your operation faces, it seems that this alternative is the most appealing from your perspective. Therefore, *unless we can agree upon a plan* for dealing with those problems which is satisfactory to both of us, your alternatives are to either secure financing through another source or to provide the PCA with a sufficient liquid margin to offset the risk position of the loan. In the latter case, our credit decisions and future financing can only be based upon your ability to maintain this liquid position.

.      .      .      .      .

In order for the PCA to finance a program similar to that which you followed in the past year, a livestock margin position of $200,000 would need to be provided. To achieve this, additional long-term financing of $400,000–$500,000 would have to be obtained to retire the estimated PCA carryover debt, plus purchase of 600 head of calves. From our standpoint, the $400,000 figure is a minimum, since the loan's liquid margin could deteriorate swiftly if your historical loss trend continues.

Finally, I should stress the point which I made earlier, that if you choose to pursue the refinancing route, you should make every effort to obtain the maximum loan possible, since our position will rely almost entirely upon a liquid margin with secondary collateral of machinery and a third mortgage with limited equity. Considering this position, our ability to finance your operation under adversity would continue only so long as the liquid margin could be maintained.

Appendix for Appellee at 4–5 (emphasis added).

The PCA extended the 1983 loan past its November 1983 maturity to allow the Nelsons time to find a long-term lender and restructure their debt. Finally, in February 1984, when the Nelsons had obtained a long-term loan commitment from Traveler's Insurance Company, PCA renewed the 1983 loan until November 1984. Travelers loaned the Nelsons $350,000, of which the Nelsons paid approximately $240,000 to PCA.

During the 1984 operating year, the Nelsons' ranch lost $61,000. As a condition to lending money to the Nelsons for 1985, PCA required the Nelsons to sign a memorandum of understanding which provided that if the ranch did not earn at least $29,725 in the 1985 operating year, the Nelsons agreed to find alternative financing and pay off their PCA loan. After careful consideration, the Nelsons signed the agreement and received another one-year loan from PCA.

In 1985 the Nelsons lost $170,000, and by October of that year they owed PCA approximately $383,000. Since then they have not applied for a loan from PCA or made any payments on the 1985 loan. When PCA obtained an Order in Replevin, the Nelsons filed for protection under the Bankruptcy Code and an adversary proceeding ensued. The bankruptcy court ultimately transferred this case to the district court.

At trial, the Nelsons raised three primary claims. First, that their discussions with PCA of a Ranch Plan amounted to an oral contract in which PCA obligated itself to finance the Nelsons for a minimum of three years while they carried out the proposed plan. The Nelsons claimed six counts of breach of the oral contract, primarily alleging that PCA unreasonably called the Nelsons' loan and did not adequately assist them in carrying out the Ranch Plan.

Although the jury found the existence and breach of a contract, the district court's order granting PCA's motion relied on two grounds in concluding that no contract had been formed. First, it concluded that the relevant evidence, interpreted in the light "most favorable to the Nelsons, did not support a conclusion that PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period or to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation." *Nelson v. Pro-*

*duction Credit Association,* 729 F.Supp. 677, 684 (D.Neb.1989). The court also held that even if the evidence did point to some kind of agreement, the terms of such an agreement were "too indefinite to permit the enforcement of the contract." *Id.*

The Nelsons' second claim was that PCA made six separate misrepresentations to them. These were: (1) that PCA intended to fund the Ranch Plan, (2) that PCA had special concern for its members beyond just acting as their commercial bank, (3) that the relationship between PCA and the Nelsons was more than just commercial lender and borrower, (4) that Nelsons were required to pay down their loan with PCA in order to make their ongoing loan relationship sound for both parties, (5) that getting $350,000 from Travelers and paying down the PCA loan would permit PCA to fund Nelsons' ranch plan, and that (6) PCA intended to act as the ranch's operating lender for at least three years so that the Nelsons could implement the ranch plan and work themselves out of debt.

The district court thoroughly considered the Nelsons' six claims of misrepresentation and concluded that the strongest testimony presented at trial, viewed in the light most favorable to the Nelsons, did not support an actionable misrepresentation claim, and, therefore, the misrepresentation claim should not have been submitted to the jury. *Id.* at 684–86.

The Nelsons' third claim was that PCA negligently failed to support the Nelsons' efforts to carry out the ranch plan. In their complaint, the Nelsons enumerated nine separate grounds for this negligence. Judge Urbom reviewed Nebraska tort law and concluded that PCA owed no fiduciary or common law duty to the Nelsons and that there could be no duty because no contract existed between the Nelsons and PCA.

The court also stated that even if evidence existed to support a contract to lend the Nelsons money, "that claim was sued under the breach of contract theory and cannot form a separate claim in negligence. Nothing in ... Nebraska law suggests that both a contract action and a negligence action are permitted when duties rest upon a contract. When a claim is based upon a failure to comply with an express contractual provision, the nature of the action is in contract, rather than in negligence." At 687 (citing *L.J. Vontz Constr. Co. v. Nebraska,* 230 Neb. 377, 432 N.W.2d 7 (1988); *Fuchs v. Parsons Constr. Co.,* 166 Neb. 188, 88 N.W.2d 648 (1958)). Because PCA owed the Nelsons no duty, fiduciary or otherwise, in its lending relationship with the Nelsons, the district court held that as a matter of law no reasonable jury could find negligence.[5] This appeal followed.

I.

The district court's decision to enter a judgment notwithstanding the verdict is a ruling of law that we review de novo, and our inquiry is the same as the district court's. *Cleverly v. Western Elec. Co.,* 594 F.2d 638, 641 (8th Cir.1979) (per curiam).

When reviewing the district court's grant of a judgment notwithstanding the verdict, we:

> 1) consider the evidence in the light most favorable to [the Nelsons], who prevailed with the jury; 2) assume that all conflicts in the evidence were resolved by the jury in [the Nelsons'] favor; 3) assume as proved all facts which [the Nelsons'] evidence tends to prove; 4) give [the Nelsons] the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and 5) affirm the [grant] of the motion if reasonable persons could [not] differ as to the conclusions to be drawn from it.

5. The court went on to review the nine negligence claims presented to the jury to determine whether, assuming a duty did exist, there was sufficient evidence to warrant presenting each claim to the jury. The court concluded that if a subsequent reviewing court did find that the PCA owed the Nelsons a duty when lending them money, then the evidence on six of the nine claims, when viewed in the light most favorable to the Nelsons, was sufficient to justify submitting the negligence question to the jury. Thus, in the event that this court were to reverse the judgment notwithstanding the verdict based on the negligence issues, the court entered an alternative ruling for a new trial on those six claims.

*Gilkerson v. Toastmaster,* 770 F.2d 133, 136 (8th Cir.1985).

In *Dace v. ACF Industries,* 722 F.2d 374, 376 (8th Cir.1983), we stated the "general proposition that only the evidence favoring the nonmoving party ... should be considered." We should affirm the lower court judgment notwithstanding the verdict only if "all of the evidence points one way and is susceptible of no reasonable inferences sustaining the position of [the Nelsons]." *Robertson Oil Co. v. Phillips Petroleum Co.,* 871 F.2d 1368, 1371 (8th Cir. 1989) (quoting *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218 (8th Cir.1985) (citations omitted), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986)). The submissibility of the various claims involves issues of state law which we are charged to review de novo. *Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

■ Applying these principles, we agree with the district court on each of its rulings and affirm the judgment notwithstanding the verdict.[6]

## A. Breach of Contract

■ The Nelsons, in challenging the judgment notwithstanding the verdict, argue that the district court failed to consider all the relevant evidence. The district court order, however, exhaustively recounts the testimony of Joe Nelson which might suggest a contract between PCA and the Nelsons. The district court correctly concluded that this testimony "does not support a conclusion that PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to full productivity over a three-year period or to restructure the Nelsons' debt situation to permit proper funding of the Nelsons' ranching operation." Op. at 684.

We could end our inquiry here. The district court, however, further held that even "[s]tretching the evidence to the point of construing some kind of three year agreement, would still leave the terms of such an agreement too indefinite to permit the enforcement of the contract." *Id.*

The Nelsons argue that the district court erred by applying North Dakota, rather than Nebraska, law in determining the enforceability of an oral agreement. They contend that the court erroneously relied on a North Dakota case, *Union State Bank v. Woell,* 434 N.W.2d 712 (N.D.1989), which explains the specificity required before Nebraska courts will enforce an oral agreement. The Nelsons point to *Davco Realty Co. v. Picnic Foods, Inc.,* 198 Neb. 193, 252 N.W.2d 142 (1977), in conjunction with *Gilbert Central Corp. v. Overland National Bank,* 232 Neb. 778, 442 N.W.2d 372 (1989),[7] and argue that Nebraska has its own common law requirements for creating binding oral contracts, and that these requirements are more lenient than those in *Woell.* The Nelsons' position is untenable.

■ *Gilbert* involved a claim of promissory estoppel, and a loan contract in a letter which included "the amount of the loan, the purpose, the parties involved, and the improvement to be financed." *Gilbert,* 442 N.W.2d at 377. *Gilbert* does not direct courts to find an enforceable contract when the alleged agreement is based on oral

---

6. Contrary to the position taken by the dissent, neither this court nor the district court has substituted a judgment for that of the jury, nor have we eroded the protection of the seventh amendment. The Supreme Court has long held that the question of whether there is sufficient evidence to support submission of an issue to the jury is a legal determination, and that entry of judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b) does not contravene the seventh amendment. *Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 322, 330, 87 S.Ct. 1072, 1076, 1080, 18 L.Ed.2d 75 (1966). *See also* 9 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2522, 2524 (1971). We here conclude that, as a matter of law, there was an insuffi-

ciency of evidence, and therefore seventh amendment concerns are not implicated. The dissent's reference to the discussion of academicians concerning trends should not deter us from performing our duty.

7. *Gilbert* was decided during the pendency of this appeal, and was not available to the district court when it issued its judgment notwithstanding the verdict. We consider it here because this court is bound by the most recent state court rulings. *Hatfield v. Bishop Clarkson Memorial Hosp.,* 701 F.2d 1266, 1268 (8th Cir.1983) (en banc).

discussions which do not fix a definite amount or specific loan terms.

■ The Nelsons have not shown that the holding in *Gilbert* is significantly different from that in *Woell*. The district court considered whether the terms of the alleged contract were reasonably certain and concluded they were not. "There was no evidence of the total amount to be loaned, or the amount to be loaned in any one year ..., or how repayment was to be made, or the interest rate to be charged, or when repayments were to be commenced or ended or the nature of the security." *Nelson*, at 684. The Nelsons argue that under *Gilbert*, oral contracts to lend money need not include the interest rate, repayment terms or the nature of the security, but need only include the loan amount, the purpose of the loan, the parties and the improvement to be financed.

The Nelsons' own argument fails, however, because, as the district court correctly held, the discussions between PCA and the Nelsons never reached any specific agreement about how much money the PCA would lend.

The Nelsons argue that a court should imply the loan amount from the circumstances, that the court should fix the loan amount taking into consideration the prior lending history, and whatever amount they needed to implement the Ranch Plan and make their ranch profitable. Neither the district court nor this court, however, can engage in such speculation. Indeed, the Nelsons themselves have been unable to predict how much money they need to be profitable. Such a finding would, in effect, require this court to establish the terms of a loan to be funded by one of the parties to the appeal.

The Nelsons also suggest that the Ranch Plan can provide a basis for the total loan amount. The Nelsons argue that the total amount can be inferred from the fact that they told Mr. Wilnerd that to implement the plan would require 1000 additional cattle in the first year. Yet, cattle prices fluctuate. The number of cattle is only one portion of the Nelsons' ranch expenses, and provides no basis for determining the ranch's total yearly operating expenses. The district court correctly found that PCA and the Nelsons did not agree on a loan amount, and even under *Gilbert*, this is fatal to the formation of a contract.

## B. Misrepresentation

■ Courts resolve the question of fraud by examining the facts of each case individually. In the Nelsons' case, the district court carefully evaluated all six of the Nelsons' alleged instances of PCA misrepresentation, and concluded that the evidence, when viewed in the light most favorable to the Nelsons did not justify submitting the issues to the jury; and therefore, judgment notwithstanding the verdict was appropriate.

We have carefully reviewed the district court's analysis of this issue. Contrary to the Nelsons' argument, the district court did not require evidence of direct false statements in order to find a submissible case on this claim. We adopt the district court's analysis in full.

## C. Negligence

The district court entered judgment notwithstanding the verdict on the Nelsons' negligence claim because it found that as a matter of law PCA owed no duty to lend money or give advice to the Nelsons. The Nelsons argue that the duty arises from the status of the parties, from Nebraska common law of lending, from contractual obligations and was voluntarily assumed by PCA.

■ The district court concluded that while there was no Nebraska law on the issue, the Nebraska Supreme Court would not impose a duty on a lender to use reasonable care in making a loan. *Nelson*, at 686. In making our de novo review of this conclusion of the district court, and having carefully considered the briefs and arguments of counsel, we are satisfied that "the district court's analytical sophistication and research have exhausted state-law inquiry." *Salve Regina College*, —— U.S. ——, ——, 111 S.Ct. 1217, 1222. Accord-

ingly, we conclude that Nebraska state law would not impose such a duty on PCA.

■ Second, we cannot conclude the district court erred in finding that PCA owed no contractual duty to the Nelsons. We have affirmed the district court's decision that there was never any contract between PCA and the Nelsons, except for the yearly short term loans. Accordingly, PCA owed no contractual duty to the Nelsons.

The Nelsons go to great lengths attempting to establish that the duty PCA owed the Nelsons stemmed from circumstances surrounding the oral contract, and not from the specific terms of the contract. The duty, they argue, arises from PCA's status as a cooperative, as an advisor, and from the misleading promises which PCA made to the Nelsons. The Nelsons argue that PCA voluntarily assumed this duty, and breached it, by tricking them into paying down their short-term debt before refusing to lend any more money.[8]

Evidence exists that PCA did attempt to advise or counsel the Nelsons. In August 1983, PCA wrote the Nelsons and warned the Nelsons that they would not be able to borrow money in the coming year unless they came up with a plan to improve their cash-flow position and reduce some of their debt. Then, in September, PCA again wrote the Nelsons questioning whether "refinancing your present debt is a solution to the problems that your operation faces." PCA advised the Nelsons to sell another piece of unrelated farm property before borrowing money to pay off the debt.

There is no evidence, however, that the Nelsons breached any duty they may have had to the Nelsons. No evidence exists suggesting that the PCA participated in developing the Ranch Plan or interfered with the daily operations of the ranch. To the extent that the PCA did attempt to counsel the Nelsons, they were unwilling to follow that advice. We are persuaded that the district court did not err when it held

that no reasonable jury could conclude that PCA owed any special duty to the Nelsons or breached any duty that might have existed.

We affirm the judgment of the district court.

HEANEY, Senior Circuit Judge, dissenting.

In my view, there was more than sufficient evidence from which the jury could find that the PCA had agreed to finance the Nelsons' three-year "ranch plan" prepared by the University of Nebraska Panhandle Station in return for the Nelsons paying down their existing operating loan with the PCA. The record shows that the Nelsons kept their end of the bargain. They went to Travelers Insurance Company and borrowed $350,000 from the company, giving as security a mortgage on their farm. They then went to the PCA and paid down their operating loan by $240,000. The PCA accepted this payment, knowing full well that acceptance would be construed by the Nelsons as acceptance of the three-year ranch plan. After receiving the $240,000, however, the PCA reneged on its agreement and refused to fund the ranch plan. The Nelsons then lost their farm, having used up all alternative sources of credit by taking out the Travelers loan.

The Nelsons' farming operation had lost money for several years, and the PCA had the right to insist that its operating loan be paid down. The Nelsons, however, had the right to condition a pay down on a commitment by the PCA to fund them for three additional years if they followed the ranch plan developed by the University of Nebraska.

The majority correctly notes that a finding that an agreement had been reached depended largely on the testimony of Joe Nelson. The jury heard his testimony and that of PCA officials. It accepted Nelson's version of the facts and found that Nelson

---

**8.** We would point out that at no time did PCA ever deny any of the Nelsons' loan requests. In the 1985 loan negotiations, PCA required the Nelsons to sign a Memorandum of Understanding whereby the Nelsons agreed to find new short term lenders if they did not earn a $29,000 profit for the coming year. The Nelsons did not make an application for funds for 1986.

and the PCA had entered into a contract. The jury had been carefully instructed about the evidence necessary to find a binding agreement. The instructions are not challenged on appeal and read as follows:

In order to be binding, an agreement must be definite and certain as to the terms and requirements. It must identify the subject matter and spell out the essential commitments and agreements with respect thereto.

Absolute certainty in the terms of an agreement is not required. Reasonable certainty is necessary. A contract is definite if the parties can tell when it has been performed and it is enough, if when that time arrives, there is in existence some standard by which performance can be tested. In the absence of a stated time for performance, the law will imply a time of performance within a reasonable time under the circumstances.

In determining whether a contract existed, and if so, the terms of that contract, you will be deciding the mutual intent of the parties. In making that determination, you may consider the conduct of the parties, oral statements, writings, and all other evidence before you.

These instructions required the jury to find that a definite and certain contract had in fact been entered into between the PCA and Nelson before it could return a verdict in the Nelsons' favor. The jury made this finding and there is abundant evidence to support it.

The Nelsons went to the Federal Land Bank for a loan. Nelson stated that he did go to that bank, and it turned him down. He then went to the Travelers Insurance Company, and it agreed to loan him $350,000 with the farm as security. Travelers also required a $17,500 letter of credit from the PCA. Wayne Goff, the president of the PCA, agreed to supply the letter. Nelson then went back to the PCA. He discussed the matter with Goff. Nelson testified that the following conversation ensued:

He said that—I asked him if $350,000 was going to be enough, they wanted four hundred to five hundred thousand, and I says is that going to be enough to make this plan work, and he says that would be fine.

Appellant's Appendix at 54.

Shortly thereafter, Nelson filled out an application with the PCA for a $453,000 loan. Joseph Nelson testified that Rod Uhrig of the PCA told him and his wife that the PCA would give Nelson an operating loan if he developed a "plan" and paid down the existing operating loan by $500,000. Nelson further testified that he had the plan developed and presented it to Goff and Tom Willnerd, Nelson's loan officer. He recounted that Goff said the plan was probably a pretty good idea but that the PCA could not do anything "until we get money put in here." Goff suggested an amount sufficient to purchase 625 feeder calves. Nelson testified that Willnerd knew that 1,000 calves were necessary to make the plan work and said, "let's do the 625 for now, and I'll get you another four hundred." Appellant's Appendix at 55. On this basis, the Nelsons signed the loan agreement. The money for the calves, however, was never provided.

Certainly this testimony, coupled with the objective facts, provided ample support for the jury's finding that the PCA agreed to provide operating capital for the expansion of the Nelsons' ranch operation to fuel productivity over a three-year period. Goff, the president of the PCA, was fully aware of the transaction and accepted the $240,000 pay down with full knowledge of the fact that the Nelsons were making the pay down to ensure continued operation of the farm. If there was a problem, Goff had an obligation to inform the Nelsons of the difficulties and clarify the situation before accepting the pay down. Instead, he took the $240,000 and reneged on the agreement. Of course, the jury could have found in favor of the PCA, but it did not, and neither this court nor the district court should substitute its judgment for theirs.[9]

---

**9.** The majority's and the lower court's decisions are part of an unfortunate trend that is eroding the protections of the seventh amendment. Appellate reversals of jury fact-finding, once rela-

The majority also adopts the district court's view that if there was a three-year agreement to provide operating capital to the Nelsons, its terms were too indefinite to permit enforcement of the contract. The jury did not believe this to be the case after hearing both sides of the question, and neither do I. The agreement was to fund the "plan" prepared by the University for a period of three years. Repayment was to be made from operating profits with interest at the rate the PCA customarily charged to farm borrowers. The PCA was to have as security all livestock and farm machinery and other farm personalty just as it had on other similar farm loans. Faced with a similar agreement in *National Farmers Org. v. Kinsley Bank*, 731 F.2d 1464 (10th Cir.1984), the court stated:

> The rate of interest and the terms of repayment could be determined by reference to commercial practice and the customary course of business between the bank and Burkhart. The market rate of interest and the purpose of the loan would be reasonable guidelines for setting the rate of interest and terms of repayment.

*Id.* at 1470. We should apply the same standard here.

I turn next to the question of damages. The PCA argued that because the Nelsons' farming operation had not been profitable in the past, it would not be profitable in the future. This same argument was advanced before the jury and rejected. We should do the same. An expert witness testified that if the plan were fully implemented, the farm would be profitable. In addition, the jury had before it detailed financial data from the PCA and the Nelsons. This data provided ample support for the jury's verdict. We should not substitute our judgment for that of the jury.

This was a close case. Obviously, the district court believed that the Nelsons had not proven their case. Had it been the fact finder, we certainly could not say that a finding of no contract would have been clearly erroneous, but the district court was not the finder of fact.

Finally, I would set aside the trial court's order for a new trial. This order was based on the same reasoning that it used in granting the judgment notwithstanding jury verdict, reasoning which I reject. I would reverse the judgment of the district court granting the PCA's motion for judgment notwithstanding verdict and, in the alternative, a new trial, and would direct that the jury verdict be reinstated. I do not believe that it was appropriate for the court to substitute its judgment for that of the jury in this case.

---

tively rare, are now occurring more frequently. *See* Schapper, *Judges Against Juries—Appellate Review of Civil Jury Verdicts*, 1989 Wis.L.Rev. 237.